[Doc. No. 100]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
HONORABLE ROBERT B. KUGLER

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | : | |
| Plaintiff, | : | Civil No. 04-1512-RBK-AMD |
| v. | : | |
| EQUITY FINANCIAL GROUP, LLC, et al., | : | |
| Defendants. | : | |

## **REPORT AND RECOMMENDATION**

This Matter comes before the Court for a Report and Recommendation concerning the Motion for Proposed Interim Distribution on Account of Investor Claims filed by the Equity Receiver Stephen T. Bobo ("Receiver"). For the reasons that follow, the Court recommends approval of the interim distribution as proposed by the Receiver with modifications as set forth below.

## **Underlying Case**

This motion arises out of an action filed on April 1, 2004 by the Commodity Futures Trading Commission ("CFTC") against defendants, Equity Financial Group, LLC; Tech Traders, Inc.; Vincent J. Firth; Robert W. Shimer; J. Vernon Abernethy; Coyt E. Murray; Magnum Capital Investments, Ltd.; Magnum Investments, Ltd.;

and Tech Traders, Ltd..  In connection with CFTC's Motion for Temporary Restraining Order, the Court appointed the Receiver by Order dated April 1, 2004.  The Order provided in relevant part that the Receiver was appointed for the purpose of "marshalling, preserving, accounting for and liquidating the assets . . . and directing, monitoring and supervising Defendants' activities. . . ."  See Order dated April 1, 2004, at 3-4.

On August 23, 2004, the District Court entered an Order setting forth the process by which investors may file claims to the funds held by the Receiver in this case.  The Order authorized and directed the Receiver to distribute claim forms and an accompanying letter to all investors who may have invested funds with one or more of the Defendants through Shasta Capital Associates, LLC, through New Century Trading, LLC, and directly with Tech Traders. See Order dated August 23, 2004, at ¶ 1.  The Order also provided that to submit valid claims, investors must identify to the Receiver the nature and extent of their interest in the receivership assets as well as the identity of all persons having a beneficial interest of any kind in their account with the Defendants.  Id. at ¶ 2.  The Order further provided that to participate in the claim process, investors must have completed and returned the claim form to the Receiver within thirty days from the date the claim forms were mailed, and investors must also have submitted to the Receiver copies of the documents showing all funds

invested with and received back from Defendants. Id. at ¶ 3.[1]
Finally, the Receiver was directed to propose a plan of
distribution to the Court upon notice to all investors, and the
Order required any objections to the proposed distribution plan to
be placed in writing, filed with the Court, and served upon the
Receiver and all parties no later than seven days before the
scheduled hearing on the proposed plan of distribution. Id. at ¶
4.

    In the proposed interim distribution motion, the Receiver
states that, under the claims process, 103 proofs of claim
asserting a total of $42,875,576.11 have been reviewed. See
Affidavit of Stephen T. Bobo in Support of Motion for Authority to
Make Interim Distribution dated January 7, 2005 (hereinafter "Bobo
Aff.") at ¶ 5. The Receiver further states that of "the 103 claims
received, only 89 actually involve funds invested with the
Defendants before the freeze and are not duplicative of a larger
proof of claim filed on behalf of an investment group of which they
are a member." Id. The Receiver initially proposed a plan for
interim distribution to 49 of the 89 claims. The claims are listed
on two schedules: an Agreed Claims Interim Distribution Schedule

---

1. The Order stated that any investor who failed to return the
forms and supporting documentation as provided in the Order would
be barred from participating in the distribution of the
receivership assets unless the investor demonstrated good cause for
the delay, all reasonable diligence in submitting the information
at the earliest possible date thereafter, and the absence of any
prejudice to the receivership estate. See Order dated August 23,
2004, at ¶ 3.

and a Disputed Claims Interim Distribution Schedule.  Initially, the claims were listed by claim number on the claim schedules attached to the Bobo Affidavit. The Receiver subsequently filed a Supplemental Affidavit listing the agreed claims and disputed claims by investor names on two separate amended distribution schedules.  <u>See</u> Supplemental Affidavit of Stephen T. Bobo in Support of Motion for Authority to Make Interim Distribution with Amended Distribution Schedules, dated January 14, 2005 (hereinafter "Supplemental Bobo Aff.").  For purposes of this Report, references to claimants will be to the schedules included in the Supplemental Bobo Aff.

The Receiver's proposed plan was mailed to investors on or about January 7, 2005.  The Court received seventeen initial objections filed in January and February 2005 concerning the motion for interim distribution.  The objections are listed on the docket as follows:  Donald DiIenno [108]; Steven Corcoran [115]; Alison Shimer [116]; Thomas E. List [117]; Stable Absolute Return Master FOF, Ltd. [118]; Marsha Green [119]; Don Zinman, individually [134], and through his attorney, J.R. Nerone, Esquire [120]; CFTC [121][2]; James Roberts; Equity Financial Group, LLC [122]; the

---

2.  The CFTC filed its own objection to the proposed plan with respect to one investor on the Agreed Claims Interim Distribution Schedule, Quest For Life, asserting that this claimant should be placed on the Disputed Claims Interim Distribution Schedule until certain discovery was completed.

Sterling entities (described _infra_) [123][3]; ICC Finance Corporation [124]; Paul G. McManigal [125]; Dr. Jeffrey Marrongelle and Barbara Marrongelle [126]; Triester International Trading Corporation [127]; and Nancy Omaha Boy [129].  One additional objection as to the interim distribution was filed on May 2, 2005 by R. Scott Batchelar [176].

The Receiver on February 25, 2005 filed a Reply to Objections to Motion for Authority to Make Interim Distribution [132]. The District Court scheduled a hearing on March 4, 2005 concerning the proposed plan of distribution.  At that time, the District Court referred the disputes to the undersigned for purposes of conducting evidentiary hearings.  Consequently, the issues in connection with the interim distribution have been determined on a Report and Recommendation basis pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

Following the March 4, 2005 proceeding, the Receiver filed a supplemental response regarding categories of objections to the interim distribution motion and a statement of disputed issues of fact [143].  The objections to the interim distribution were delineated into two major groups:  objections that disputed the proposed method for determining individual distributions and objections by claimants whose claims were placed on the Disputed

_____

3.  The CFTC also filed a response [150] to the objections raised by the Sterling claimants.

5

Claims Interim Distribution Schedule. The Receiver further recommended that the Court determine the overall plan of distribution first and then consider at a later date any issues regarding claims on the Disputed Claims Interim Distribution Schedule. The Receiver also filed stipulations of facts on March 31, 2005 with respect to two investors, Donald DiIenno [151] and Don Zinman [152], who had filed objections.

Following the interim distribution proposal which sets forth the proposed initial distribution to agreed claims, the Receiver filed specific objections to thirty-one claimants on March 31, 2005. See Equity Receiver's Objections to Certain Investor Claims, dated March 31, 2005 [153]. The Court set a schedule for the filing of responses by such claimants to the Receiver's objections to their claims. By notice from the Receiver [156] dated April 13, 2005, claimants whose claims were subject to the Receiver's objections were required to respond to the legal issues raised by the Receiver's objections by May 6, 2005, and any responses to the factual basis concerning the Receiver's objections to the claimants' claims were to be filed by May 13, 2005. In this regard, a number of claimants filed responses to the Receiver's objections, some of whom also filed objections to the Receiver's interim distribution. The claimants filing responses to the Receiver's objections as noted on the docket were Nancy Omaha Boy [178]; Alison Shimer [180]; Dr. Edward J. Evors [181, 193]; Marsha

Green [182, 191]; Thomas List [183, 192]; Sterling entities [185, 194, 195]; Wayne Gideons [187][4]; and Jeffrey and Barbara Marrongelle [190].  On May 20, 2005, the CFTC also filed its objections to claims of the following claimants: Quest for Life, Alison Shimer, Bally Lines, Ltd., Dream Venture Group, Snyder Financial Services/Janelle Wagner Trust, and Universe Capital Appreciation, LLC.  See Objection of the Commodity Futures Trading Commission to the Claims of Certain Claimants [210] at 2.  Those second wave of responses relate to the Receiver's placement of certain claims on the Disputed Claims Schedule.  This second wave of responses does not impact the interim distribution motion.  The Court has scheduled a conference on September 19, 2005 and disputed claims hearings on September 28, 2005 with respect to these claimants.

In connection with the interim distribution, the Court also scheduled an evidentiary hearing on May 13, 2005 concerning certain issues raised by the Sterling entities' objections.  In addition, at that time, the Receiver advised the Court that some of the factual issues relating to two of the objections by claimants, Don Zinman and Donald DiIenno, to the interim distribution motion had been resolved by stipulation.

---

4.  Wayne Gideons filed a letter with the Court advising that he has no funds invested.  The Court notes that Gideons is not listed on either of the distribution schedules.

For purposes of this Report and Recommendation, the Court will consider those objections that specifically relate to the issues raised by the interim distribution motion, all as more fully described below.

**Factual Basis Underlying The Interim Distribution Motion**

Before addressing the interim distribution proposed by the Receiver, the Court sets forth below the factual basis for this action, as described by the Receiver in his affidavit in support of the interim distribution motion. Defendant Coyt E. Murray operated a commodity trading investment company called Magnum Investments, Ltd. beginning some time before 1998. Bobo Aff. at ¶ 9. Magnum transferred much of its investors' funds to commodity futures trading accounts with Refco, LLC, a futures commission merchant. Id. According to the Receiver, Magnum received a total of $5.4 million from sources other than Tech Traders since January 1998. Id. at ¶ 10. The Magnum accounts[5] at Refco lost a total of $2.9 million in commodity trading from February 1998 through May 2002. Id. at ¶ 11. From the middle of 2002, Magnum received regular transfers of funds from Tech Traders which Magnum disbursed to payees. The Receiver is still reviewing those disbursements. As set forth below, the Receiver has not indicated at this time a claims process for Magnum Investors or creditors; however, the

---

5. One of the Magnum accounts was in the name of Magnum Capital Investments, Ltd., which the Receiver reports had losses of approximately $190,000.00. Bobo Aff. at ¶ 11.

Receiver reports that initial review reveals that approximately $5.4 million was deposited in Magnum's bank account from outside sources after January 1, 1998, not including $2.4 million transferred to Magnum from Tech Traders.  Id. at ¶ 22.

The Receiver further states that during that period, Murray conducted commodity trading activities similar to Magnum's activities through the two Tech Trader entities.[6]  Id. at ¶ 13. Under such activities, the investments were structured as loans to Tech Traders and the investors were to receive in return a fixed amount of interest plus a substantial share of trading profits. Id.  However, according to the Receiver, there is "no evidence of profitable economic activity undertaken by Tech Traders."  Id. at ¶ 17.  Moreover, "the only source of funds that Tech Traders used to repay its investors (or for any of the other purposes) was the funds sent to it by various investors."  Id.

The Receiver reports that $43.2 million was invested with Tech Traders from April 12, 2001 through April 1, 2004 as follows: (a) $13.9 million from Shasta Capital Associates, LLC ("Shasta"); Shasta had approximately 70 investors and received back $1.6 million from Tech Traders which it disbursed to some of its

---

6.  The Receiver reports that Tech Traders, Inc.'s principal place of business was the Gastonia, North Carolina premises used by Magnum, and that another Tech Traders entity, Tech Traders, Ltd., apparently had little or no actual business.  Id. at ¶ 14.  For purposes of distributing receivership funds, the Receiver has made no distinction between the two Tech Traders entities.  See id.

investors; (b) $15.9 million from the Sterling entities as described below; (c) $273,000.00 from New Century Trading, LLC, a smaller commodity pool controlled by Defendant Shimer; and (d) the balance from thirteen investors with no apparent ties to Defendants Shimer or Firth or to the Sterling entities.  Id. at ¶¶ 15, 19.

The Receiver reports that "Shasta was a commodity pool operated by Defendants Shimer and Firth."  Id. at ¶ 19.  The managerial member was Equity Financial Group, LLC, also controlled by Defendants Shimer and Firth.  Id.  According to the Receiver, Shasta took in approximately $14 million from investors, deducted a one percent (1%) charge for legal and accounting fees, and sent the balance to Tech Traders to fund trading in the commodity futures market.  Id.  Shasta did not place any of the funds received from its investors in any other investments.  Id. As set forth below, several Shasta investors have filed objections to the proposed pro rata distribution based on their assertion that their deposits should be traced into Shasta's bank accounts and claim they should then receive a full refund or at least a greater percentage distribution than the proposed distribution.  The Court will address these objections in detail below.

As to the use of funds by Tech Traders, the Receiver approximates the following:

Approximate Use of Funds by Tech Traders

| | |
|---|---|
| Net Trading Losses | $  7.4 million |
| Repayments to Investors (including Shasta and the Sterling entities) | $ 12.0 million |
| Transferred to affiliate Magnum | $  2.4 million |
| Operating Expenses (including payments to or on behalf of members of the Murray family and commissions) | $  1.8 million |
| Transferred to Kaivalya Holding Group, Edgar Holdings, and Equity Financial Group, LLC | $  2.2 million |
| Unknown or not yet categorized | $   .1 million |
| Remaining as of April 1, 2004 in Tech Traders' accounts | $ 17.5 million |

Bobo Aff. at ¶ 16.

The Receiver currently holds a total of $17,555,742.46 in the Receivership bank accounts, including interest accrued through May 31, 2005.[7] See Third Interim Report of Equity Receiver [219] dated June 8, 2005. The Receiver seeks authority from the Court to make an initial distribution of as much as $10.4 million to investors of Tech Traders and Shasta. Bobo Aff. at ¶ 20. The total amount shown on claim forms for actual funds invested (and disregarding any claimed 'profits' or 'interest' shown on Defendants' account statements) is $42,875,576.11. See Memorandum in Support of Motion of Equity Receiver for Authority to Make

---

7. The Receiver also holds $2 million in an account at Man Financial in the name of Sterling Trust (Anguilla) Ltd.. Id. at ¶ 20.

Interim Distribution on Account of Investor Claims (hereinafter "Bobo Br.") at 18-19; see also Bobo Aff. at ¶ 5.  The investors claim to have received a total of $8,182,094.12 in withdrawals before the freeze order.  Bobo Br. at 19.  The Receiver seeks to reserve the undistributed funds pending resolution of issues related to objections to other investors, a review of the claim process for creditors of Defendants,[8] for ongoing continuing costs of administration of the Receivership estate, and for the possibility that the Court order distribution to be made with respect to investor or creditor claims against the Magnum entities. Bobo Aff. at ¶¶ 21, 22.

### The Receiver's Proposed Distribution

The Receiver proposes interim distribution to each approved claimant based upon the following formula:  38 percent (38%) of each investor's total investment amount ("Gross Distribution Amount") less any amounts paid by Defendants to such investor as withdrawals.  Bobo Br. at 18.  Such amount is designated as the "Net Distribution Amount." Id. The Net Distribution Amount is proposed to be distributed to investors whose claims have been allowed.  Id.  The initial distribution of the thirty-eight percent (38%) proposed could be as much as $10.4

---

8.  Trade creditor claims are estimated by the Receiver to be a small fraction of the total investor claim amount.  Bobo Aff. at ¶ 21, n.3.

million of the approximate $17.5 million currently held by the Receiver.[9] Id. at 19.

In proposing the interim distribution, the Receiver considered a number of issues, including: "[t]he timing of the distribution; [t]he total dollar amount of an initial distribution; [w]hether to disregard profits or earnings reported by the Defendants in determining claim amounts; [w]hether to distribute the funds pro rata or according to tracing principles; [h]ow to treat amounts already repaid to investors; [w]hether multiple accounts in which an investor holds a beneficial interest should be aggregated for purposes of distribution; [w]hether funds invested after the initial freeze order should be returned to the investors; and [i]n the cases of investors that are themselves investment groups, how to ensure that those groups in turn fairly allocate the distributions among their members." Bobo Br. at 7-8. In resolving the issues, the Receiver proposes the following:

1.   Claimants must disclose the beneficial owners of claimant investors. See infra.

2.   Claims should be based upon actual funds invested. In this regard, the Receiver has rejected recognition of any profit, interest or other earnings on any investor account statements. Id. at 9.

_____

9.   In addition, funds remain frozen in account number 37923 at Man Financial which have a value of nearly $2 million.

3.   Distribution is proposed on a pro rata distribution for investors before April 1, 2004 when the CFTC initiated this action.  In so doing, the Receiver has rejected the "first in, first out method" and any "tracing" method of distribution.  See id. at 10-12.  The Receiver bases his proposal for a pro rata distribution on his assertion that Tech Traders ran a classic Ponzi scheme operation, as evidenced by the fact that there is "no evidence of profitable economic activity undertaken by Tech Traders" and the only source of funds used by Tech Traders to repay investors was "funds sent to it by various investors." Bobo Br. at 9-10; see also Bobo Aff. at ¶ 17.   He asserts that such distribution is supported by the fundamental principle that in any distribution, similarly situated investors must be treated alike so as to preserve equity and fairness, as set forth in the seminal Ponzi scheme case, Cunningham v. Brown, 256 U.S. 1 (1924).  Bobo Br. at 10-11.  In Cunningham, certain creditors defrauded by Charles Ponzi attempted to rescind their contracts with Ponzi and to establish a presumption of tracing to remove their money from a receivership fund before other defrauded creditors could reach it. Cunningham, 256 U.S. at 12.  The Court noted that the rule in Clayton's Case, 1 Merivale 572 (1816 Ch.), which supported distribution to claimants in the inverse order in which the money was deposited into the account, had no application in the case before it and concluded that both those creditors who had rescinded

14

for fraud and those who relied on the Ponzi contract for payment were all creditors and thus occupied the same legal position, and that equity would not permit a preference to those who were "successful in the race of diligence." Id. at 12-13.  Likewise, in the case before this Court, the Receiver asserts that the claimants are similarly situated and are thus entitled to a pro rata distribution of the receivership estate, as each claimant invested money with Defendants before April 1, 2004, expected a return on that investment from the same underlying trading activities, and awaits relief from the Receiver.  Bobo Br. at 10.

4.  With respect to withdrawals, the Receiver proposes that the amount of the distribution to be made by the Receivership estate on an investor's claim should be reduced by the total amount of withdrawals.  Under this proposal, called the "rising tide" method, distributions are calculated as follows:  (actual dollars invested $x$ pro rata multiplier) less withdrawals previously received equals distribution amount.  In so doing, the Receiver has rejected other methods (to be discussed infra).  Id. at 15.

5.  With respect to investors with ownership interests in multiple accounts in different capacities, the Receiver proposes that the transactions be consolidated.  Id. at 19.

6.  Investors who are members of a group of beneficial owners of an investor account are deemed owners of the account in equal shares unless another ownership method is proven.  Id. at 20.

15

7.   Funds received by Defendants after the Court froze the assets on April 1, 2004 are proposed to be returned to the appropriate investors with one limited exception as to investor Dr. Marsha Green.  Green has objected to this proposed treatment.  <u>Id.</u> at 21-22.[10]

8.   The Receiver also proposes that an authorized representative of each investment group will be required to submit to the Receiver a proposed method of allocating the distribution funds among the beneficial owners of that group.  In addition, each group will be required to take into account withdrawals received by their respective members on account of their investments with Defendants utilizing the same pro rata distribution approach.  <u>Id.</u> at 24.

9.   Distribution through Tiers.   In addition, the Receiver has categorized investors by Tiers:   Tier I investors invested directly with Tech Traders; Tier II investors invested with Tier I entities; Tier III investors invested with Tier II entities.  <u>See</u> Reply to Response to Motion [132] at 13.  The Tier I entities are as follows:  Shasta; each Sterling entity (with the exceptions as set forth <u>infra</u> of Sterling Trust (Anguilla), Ltd.); Future Dreams, LLC; Dream Ventures Group, LLC; Quest for Life;

_____

10.  As set forth more fully below, the Receiver proposes that if Shasta investors are treated as Tier II investors, then the amounts in Shasta's escrow account that had not been transferred to Tech Traders shall be considered as part of Shasta's distribution amount.

Habitation Pioneers; Snyder Financial Services; Triple C. Corporation; Patton & Associates; Sws Investments; ICC Finance Corporation; Fitz N. Harper Jrl., M.D.P.C.; New Century Trading, LLC; and Rola, LLC.

The Receiver initially proposed a combined Tech Traders and Shasta distribution which differentiates between Shasta and other Tier I investors. Reply to Response to Motion [132] at 13. In so doing, the Receiver noted Shasta's managing member, EFG, and those who controlled it, Robert Shimer and Vincent Firth, are named Defendants and that Shasta is under the control of the Receiver whereas, for example, other Tier I entities, such as Bally Lines, Ltd., are not defendants and are not under the control of the Receiver. Id. Consequently, the Receiver listed Shasta investors directly on the Agreed or Disputed Claims Interim Distribution Schedules whereas other Tier II claimants are not listed on the Schedules, but rather are proposed to receive any distributions based on amounts to be distributed to their corresponding Tier I investors. See id. at 13-14.

The Receiver also initially proposed that the amounts in the Shasta Escrow account be treated as part of the Receivership's funds, asserting that Shasta acted as a conduit for the transfer of funds to Tech Traders. Reply to Response to Motion [132] at 7. In so recommending, the Receiver noted that the Shasta LLC operating agreement provided in relevant part that "[I]nitial Capital

17

contributions and additional capital received from each Member shall be allocated [to each Member's Capital Account] as follows: 99% of each Member's capital contribution (whether initial or additional) shall be allocated to that Member's Trading Capital Account for placement with the Trading Company [Tech Traders]." Id. (quoting Operating Agreement, Shasta Capital Associates, LLC, attached at Exhibit C to Investor Don Zinman's Objection [120]).

Donald DiIenno, one of the investors of Tier I investor Bally Lines, objects to the Receiver's treatment for Shasta. Specifically, DiIenno, who did not invest directly with Tech Traders, but rather with Bally Lines, argues, as set forth more fully below, that his claim should be treated as if he had invested directly with Tech Traders so that he would not be affected if Bally Lines' claims are disallowed or reduced as a result of withdrawals by Bally. In response, the Receiver states that there is a fair basis to treat Shasta investors directly as compared to other Tier II investors. First, as noted by the Receiver, because Shasta is a receivership entity, the Receiver has "accurate information available regarding Shasta's transactions and the identity of all of its investors" enabling the Receiver to implement a claims process and recommend distribution to Shasta's investors "with a reasonable degree of confidence that it is fair and equitable." Reply to Response to Motion [132] at 13. In addition, the Receiver points out that the Receiver does not know whether "other Tier One entities acted as mere conduits to Tech

Traders, or whether some or all of them also engaged in other economic activities" and that this reason, as well as the fact that the Receiver does not know the identities of the individual investors in other Tier I entities, makes it "impractical" to commence a Tier II claim process or direct distributions to Tier II investors. Id. If Tier II investors' distributions were calculated as Tier I investors, the impact would likely increase in some cases the amount received by some Tier II investors, diluting the recovery of other investors. To address the issue of distribution by the other Tier I entities, to which the Receiver is not in contractual privity, to their individual Tier II investors, the Receiver has proposed that Tier I investors submit for advance approval the proposed allocation of the distribution amounts they would receive under any distribution.

However, as a result of this objection, the Receiver has proposed an alternative treatment of Shasta investors as it relates to distribution, an approach the Receiver states is more "theoretically consistent with the treatment of the other Tier One entities and their Tier Two investors." Reply to Response to Motion [132] at 17. Specifically, the Receiver states that instead of grouping Shasta Tier II investors with Tier I investors for purposes of one single joint distribution, Shasta in the aggregate could be treated as a Tier I investor. In this case, Shasta would receive a pro rata distribution from Tech Traders as other Tier I investors and then Shasta (or since it is part of the receivership

estate, the Receiver) would make a pro rata distribution to its Tier II investors.  This approach would then result in Shasta's claim being based upon the total amount it transferred to Tech Traders, which is $14,363,658.20.  _Id._ at 15.  The gross distribution amount of that claim based on a thirty-eight percent (38%) distribution would then be calculated and the total net distribution amount would be the remaining amount after deduction of amounts Tech Traders previously repaid to Shasta.  _Id._  If Shasta is treated as a Tier I investor, the Receiver proposes that the escrow amounts currently in the Shasta account would be combined with the amount to fund the distribution to Shasta's Tier II investors.  _Id._  Under the first proposal, the escrow amount is considered part of the total amount to Tech Traders for distribution even though the funds had not been transferred to Tech Traders prior to the freeze order.  For the reasons set forth below, the Court agrees that Shasta should be treated as a Tier I investor for distributions.

If such treatment is accorded Shasta, then the Receiver proposes two other modifications.  First, the Receiver, to be consistent with the April 1, 2004 freeze order, would place in the Shasta distribution the Shasta wire transfer in the amount of $480,277.00 which was initiated by Shasta's bank at 7:03 a.m., April 2, 2004, and received a minute later at Tech Trader's bank. _Id._ at 15.  This treatment is consistent with the April 1, 2004 freeze order.  Second, in light of the fact that certain

administration efforts focused on Shasta separately, including issues related to Shasta tax matters and investigating potential claims, the Receiver proposes that Shasta bear a portion of the costs of administration of the Receivership estate. Id. The Receiver recommends that $200,000.00 from Shasta's funds be held in reserve for this purpose. Id. The Receiver concludes that if the wire transfer were reversed and if at least $200,000.00 were reserved for bearing a reasonable portion of the costs of administration, "Shasta would have sufficient cash available to make its own 38 percent distribution to its investors, with each Shasta investor to receive the same distribution treatment" as outlined in the distribution schedules. Id. at 16. The Receiver further points out that this method "would also obviate certain other issues that would otherwise have to be sorted out in the final distribution of funds. These include the application of the funds remaining in Shasta's bank account and how to account for the one percent deduction that Shasta took from each investment it received for the stated purpose of defraying its legal and accounting costs." Id. at 17. The Receiver further notes that in subsequent distributions, Shasta could well have either a greater or a lesser percentage amount available to distribute to its investors than to Tech Traders. Id. "Perhaps most fundamentally, separate distributions for Shasta and New Century would cause these entities to be treated essentially the same as the other Tier One investors, and Shasta's Tier Two investors would be entitled only

21

to their proportionate share of Shasta's own funds, for better or worse, just as other Tier Two investors should be entitled only to a proportionate share of the funds available in the entities in which they invest." Id. at 17-18.  For the reasons that follow, the Court accepts this treatment of Shasta, and the interim distribution plan shall be so modified.[11]

**Resolution of Objections With Regard
to the Proposed Interim Distribution**

As noted above, a number of claimants filed objections to the interim distribution.  The objections can be divided into three categories: (1) objections because their claims were not included on the Agreed Claims Distribution Schedule as follows: Marsha Green; Thomas List; Alison Shimer; Nancy Omaha Boy (this claimant has raised issues to the proposed distribution addressed below); Jeffery and Barbara Marrongelle; James Roberts; and the Sterling entities; (2) objections based on the methodology of the proposed interim distribution; (3) and objections based on certain claims being included in the proposed Agreed Claims Interim Distribution Schedule.  The Court now addresses these objections and makes the following findings and conclusions as set forth below.

---

11.  The Court notes that the Receiver by filing dated August 16, 2005 set forth a proposal for distribution to investors of Universe, a Tier II Shasta investor, as a result of objections raised by the CFTC to Universe.  See Recommendation of Stephen T. Bobo, Equity Receiver, Regarding Treatment of Universe Capital Appreciation, LLC [241] at 4.  The Court will consider this proposed treatment in connection with the resolution of disputed claims.

Objections of Marsha Green, Nancy Omaha Boy and Thomas List: As noted by the Receiver in his reply, these investors dispute having their claims listed on the Disputed Claims Interim Disbursement Schedule as a result of their receipt of funds from Tech Traders for which they claim is repayment for investments in another entity, Kaivalya Holding Group, Inc. ("Kaivalya"). Specifically, these investors apparently invested funds in Kaivalya, which the Receiver has stated was apparently intended to pool investor funds and use those funds for commodity trading through Magnum, although the Receiver states that funds "apparently never actually reached Magnum and instead were improperly diverted to other uses." Bobo. Aff. at ¶ 26; see also Reply to Investors' Responses to Equity Receiver's Objections to Certain Investor Claims [209] at 4, n.4. The Receiver further states that Defendant Shimer was one of the persons who directed activities of Kaivalya. Bobo Aff. at ¶ 26. Although funds of Kaivalya were never invested in Tech Traders, certain investors of Kaivalya received withdrawals from Tech Traders' funds as a result of or in partial repayment of Kaivalya losses.[12] The Receiver proposes that these payments be

---

12. The Receiver states that in 2002, "Shimer arranged with Coyt E. Murray that Tech Traders would pay Shadetree Investment Trust (Shadetree), another Shimer-controlled entity, one-half of Tech Traders' 50% share of the net profits purportedly earned on Shasta funds each month. Beginning in July 2002 and each month thereafter, Shimer directed Murray as to how much of Shadetree's portion of Tech Traders' share of the Shasta's fictitious earnings to send directly to various Shimer-controlled entities, including Kaivalya, as well as to Defendant Equity Financial Group, LLC.
(continued...)

treated as withdrawals for purposes of determining the net distribution amount of any investments in Shasta or Tech Traders. Specifically, the Receiver asserts that these withdrawals, regardless of how characterized (such as "return of Kaivalya principal"), should be funds deducted from the investor's respective pro rata distribution under the proposed plan of distribution. In support of this approach, the Receiver notes that the funds received by Kaivalya from Tech Traders were used to repay some of Kaivalya's investors and were not made on account of any funds actually invested in Tech Traders or Magnum. Accordingly, the Receiver posits that the investors who did not invest with Tech Traders "have no right to receive or retain funds that came from Tech Traders' investors." Bobo Br. at 23. However, the individual investors object to this treatment and assert: (1) that the Receiver treat Kaivalya investors as the Shasta investors; and (2) that it is inequitable to treat Kaivalya repayments as prior withdrawals.

The Court has reviewed the nature of these objections and concludes that, to the extent these claimants object to the interim

---

12.  (...continued)
Since Tech Traders had no actual trading profits or other earnings, the funds it sent monthly to Kaivalya and the other Shimer-controlled entities necessarily came from the money that other people had invested with Tech Traders.  Kaivalya received a total of $1.3 million from Tech Traders between July 2002 and March 2004, and Kaivalya had no other significant source of funds during that period."  See Bobo Aff. at ¶¶ 27-28.

distribution because of the Receiver's proposed treatment of the Kaivalya withdrawals, the objection is rejected.  First, the Court finds, based on the Receiver's Affidavit, that no funds from Kaivalya were ever invested in Tech Traders.  The Court further finds that Shasta invested more than $14 million with Tech Traders.  This critical distinction is sufficient to approve the Receiver's treatment of Shasta as an investor with Tech Traders while rejecting Kaivalya as an investor with Tech Traders.  Moreover, although both Kaivalya and Magnum were controlled by Shimer, the Receiver has indicated that there is no evidence available that funds of Kaivalya were transferred to Magnum and the Receiver also states that at this time Magnum remains a separate entity for purposes of the proposed distribution.

As to the second objection - whether to treat the specific Kaivalya repayments as withdrawals, the Court finds that this issue does not impact the proposed interim distribution methodology; rather, the issue raised by these specific objections - that is, whether any investor's receipt of funds from Kaivalya should be classified as withdrawals for purposes of distribution - shall be resolved through the evidentiary hearings to be conducted as part of the resolution of the Receiver's objections to certain investor's claims.[13]  Accordingly, a date for hearings on the

_____

13.  At a status conference held on August 16, 2005, the Court scheduled a telephone status conference for September 19, 2005 with respect to the Green, Omaha Boy, List, and Marrongelle disputed claims.

disputed claims has been set for September 28, 2005.  Consequently, these objections are overruled to the extent that they contest the interim distribution.

Jeffrey and Barbara Marrongelle.  These claimants object to the listing of their claim on the Disputed Claims Interim Disbursement Schedule.  The Receiver has filed a specific objection to their claim based on the Receiver's assertion that the Marrongelles received repayment from Edgar Holding Group, Inc. ("Edgar"), a Shimer-organized entity, with funds that came from Tech Traders, although as was the case with Kaivalya, Edgar did not invest in Tech Traders.  Reply to Response to Motion [132] at 10-11.  The Receiver proposes the same treatment of claimants that invested in Edgar as that of which is proposed for Kaivalya.  See id.  Similar to the Kaivalya issue, the issues raised by this objection do not affect the interim distribution motion and will be determined in connection with the hearings scheduled for the Receiver's objections to certain claims.  Consequently, these claims are also overruled to the extent they contest the interim distribution.

CFTC Objection as to Quest For Life.  The CFTC has objected [121] to the Receiver's placement of Quest For Life's claim on the Agreed Claims Interim Distribution Schedule.  The Receiver does not object to placement of Quest for Life's claim on the Disputed Claims Interim Distribution Schedule.  Reply to

26

Response to Motion [132] at 22.  Accordingly, this objection is sustained.

Alison Shimer.  Alison Shimer's objection is based upon the Receiver's designation of this claim on the Disputed Claims Interim Distribution Schedule.  The Court finds that the objection does not impact the interim distribution motion, and therefore is overruled to that extent.  Further, the Court notes that the Receiver has objected to this claim for a number of reasons, including the assertion that the funds invested by Shimer in the Shasta investment were apparently from the joint account maintained with Defendant Robert Shimer.  See Reply to Response to Motion [132] at 3-4.  In a telephone conference on August 16, 2005, Robert Shimer represented to the Court that Alison Shimer requests that her claim be placed in abeyance pending the District Court's ruling on Robert Shimer's motion for summary judgment.  Alison Shimer has confirmed in writing, filed on August 16, 2005, her request that her claim be placed in abeyance, and the Receiver's objections to the issues related to Shimer's claim shall be decided through the Disputed Claim Process.

Nancy Omaha Boy [129].  Nancy Omaha Boy objects to any distribution at this time for a number of reasons.  She asserts that because the Receiver has not determined whether the Magnum entities should be consolidated, partial distribution is inappropriate.  To address this objection, the Receiver proposes,

and the Court concurs, that sufficient funds be reserved from the interim distribution in the event the Court consolidates the Magnum investors in this action.   Such procedure, the Court finds, addresses her objection and such objection is overruled as the basis of the objection is not a sufficient basis to delay determination of interim distribution.

Boy further asserts that no distribution should be made until the Court determines whether any claimants who made investments through Defendant Shimer other than those related to Tech Traders should be entitled to recover their alleged losses in this proceeding.  Response and Objections of Claimant Nancy Omaha Boy to Motion of Equity Receiver for Authority to Make Interim Distribution on Account of Investor Claims at 2.  Specifically, she asserts that some of the Receiver's funds were derived from Shimer's escrow account and none of these funds should be distributed until such time as it is determined that the funds were not related to or commingled with other activities engaged in by Shimer and which this claimant alleges were fraudulent.  Id.  The Receiver's response to this objection is that the only other "Shimer-organized entity" that invested with Tech Traders is New Century, LLC ("New Century"), and the Court so finds.  Reply to Response to Motion [132] at 3.  The Receiver further asserts that New Century had only two investors and these two investors are not listed on the Agreed Claims Interim Distribution Schedule.  See id.

28

In fact, the Receiver has objected to these two investors' claims.[14] See Equity Receiver's Objections to Certain Investor Claims [153] dated March 31, 2005, at 3-4.  Moreover, the Receiver states that "[n]one of the funds invested with Shasta or New Century went to any investment other than Tech Traders, and there is no indication that funds from any [of] these other Shimer-related investments went into Tech Traders."  Reply to Response to Motion [132] at 3. The Court finds that these objections raised by this investor do not warrant rejection of the interim distribution motion. Moreover, after review of the objection and Boy's response [178] to the Receiver's objection to her claim, the Court finds that Boy's objection that her receipt of funds from Kaviyala be treated as withdrawals shall be resolved in connection with the disputed claims hearings scheduled for September 28, 2005.

This investor also objects to the Receiver's interim distribution proposed process because it does not contemplate that all withdrawals be repaid to the receivership estate before their respective claims be allowed.  The Court overrules this objection for the reasons set forth in Section 4.

Paul McManigal [125].  This claimant objects to the proposed distribution method for multiple accounts of a single investor.  Specifically, Mr. McManigal asserts that he invested $366,000.00 in Shasta Capital with Equity Financial Group through

_____

14.  These two claims are as follows:  Claim #31 and Claim #43.

an individual retirement account, which he asserts is the property of he and his wife, and $100,000.00 into Shasta through a trust he owns outright.  Objection to the Distribution Motion of January 5, 2005 by Stephen T. Bobo [125] at 1-2.  He claims that the Receiver should segregate his investments for purposes of distribution.  Id. For the reasons set forth in Section 5, the Court rejects this objection.

ICC Finance Corporation [124].  This claimant objects in a two-page objection to the exclusion of ICC Finance Corporation from the Agreed Claims Interim Distribution Schedule.  In addition, ICC asserts that no disclosure has been made by the Receiver as to the exact amount deposited with Tech Traders/Coyt Murray.  The Receiver notes in his reply that until this objection, this claimant never requested any information.  Reply to Response to Motion [132] at 5.  In addition, the Receiver notes that the claim form submitted (and sworn to) by ICC, claims an investment of $400,000.00 and withdrawals of $411,115.00, although it states in its claim form that only $300,000.00 of the $400,000.00 invested by ICC involves cash funds and that the remaining $100,000.00 comprised alleged "earned profits and interest" reinvested in Tech Traders by ICC.  Id. at 5, n.2.  However, the Receiver further notes that "[a]ccording to the bank statements, ICC deposited $299,980 and withdrew $411,115; well in excess of the $114,678 ICC now claims to have withdrawn.  The statements show that ICC has

30

received well over 100 percent return on its investment, and the Receiver, therefore, does not support an additional distribution to ICC." Id.  The Court finds that ICC's objection is without merit and it raises no issues with respect to the interim distribution, and it is therefore overruled.

Don Zinman [120, 134].  Don Zinman ("Zinman") has filed several objections.  (1) Zinman objects to the application of the pro rata formula for an interim distribution and seeks a higher percentage of the $150,000.00 invested on February 25, 2004.  See Zinman Obj. at 2.  Specifically, he asks the Court to adopt a tracing approach in which the amount of time each investor's funds were at risk is determined by reviewing the time and months the amounts were in the control of Tech Trader.  See id. at 3-4.  He proposes that after such review, the Receiver should arrive at a proper rate of loss per unit of time and then apply that rate to each specific investment as of the date of the investment.[15]  Id. at 9-10.  (2) He also seeks a full refund of the $100,000.00 he invested in late March 2004 in the Shasta Citibank Escrow Account, asserting that those funds were never forwarded to Tech Traders. Id. at 3.  Zinman further asserts that as to his $100,000.00 deposit, the check was postdated April 17, 2004, and therefore,

---

15.  In this regard, Zinman suggests that the Court instruct the Receiver to hire a professional expert to make a historical study of the individual investment contributions of each separate defendant and individual investor contributions of each in relation to Tech Traders trading activity.  Zinman Obj. at 10-11.

should not have been cashed until that date.  Id.  Although he
acknowledges that it cleared Shasta's account on March 29, 2004, he
argues that the amount was easily traceable to him and was never at
risk.[16]  Id. at 4.  His second objection relates to the tracing
argument set forth below.  Specifically, as set forth above, the
Receiver has proposed the same pro rata distribution for claimants
of alleged claims who invested in Shasta's account at the time of
the freeze order even though the funds had not actually been
transferred to Tech Traders.  Zinman's objections with respect to
the Escrow Account are based upon Clayton's Case, 1 Merivale 572
(1816 Ch.).  For reasons set forth below in Section 3, this
objection is overruled.

Steven Corcoran [115].  Corcoran objects to the proposed
distribution methodology of using April 1, 2004 as the proposed end
date for treatment of funds as part of the receivership estate.  As
the Receiver notes, notwithstanding the "short time these funds
were in the account of either Shasta or Tech Traders, Corcoran
transferred $50,000 to Shasta before the freeze order."  Reply to

---

16.  After the filing of his objection, the Receiver and Zinman
reached a stipulation as to certain facts for the limited purpose
of resolving his objections to the motion for authority to make an
interim distribution.  Those stipulations are as follows:  (1)
Zinman invested funds in Shasta; (2) In late March 2004, Zinman
sent a personal check in the amount of $100,000.00 to be invested
in Shasta; (3) Zinman's check was deposited in Shasta's bank
account on March 26, 2004; (4) On March 29, 2004, Zinman's bank
honored his check.  See Stipulation of Facts Concerning Objection
of Donald Zinman filed March 31, 2005 [152].

Response to Motion [132] at 9.  The Receiver's proposal to treat accounts in Shasta as of April 1, 2004 to the same 38 percent distribution as those funds in Tech Traders is appropriate.  The Court finds that Corcoran transferred the funds before the freeze order, and therefore, the funds were at risk as soon as they were deposited into Shasta's account.  Corcoran's objection is overruled.  Moreover, to the extent that Corcoran argues that his investment in Shasta should be traced, the Court rejects this argument for the reasons that tracing is rejected as set forth below in Section 3.  However, for the reasons that follow, the Shasta Escrow funds will be deemed part of the Shasta amounts for distribution.

Triester International Trading Corporation ("TITC") [127].  TITC objects to the Receiver's distribution on a pro rata basis of its $100,000.00 investment claiming that its funds constituted additional subscription funds that were in Defendant Shimer's attorney escrow fund at the time of the Court's April 1, 2004 freeze order.[17]  See Objection of Triester International

---

17.  TITC states that on February 6, 2004, it executed a Subscription Agreement for 1,000 member shares of Shasta Capital and that in accordance with the Subscription Agreement TITC remitted a check for $100,000.00 to Defendant Shimer.  See Objection of Triester International Trading Corporation at 2. These funds were purportedly deposited by Defendant Shimer in the Shasta attorney escrow account with Citibank and were subsequently transferred to Tech Traders and traded with the funds of other investors in pooled trading accounts maintained by Tech Traders. Id.  TITC asserts that on March 25, 2004, it then executed an
(continued...)

Trading Corporation at 2-3.  TITC's argument is based upon the Court employing a tracing theory for investments.  The Receiver argues that TITC "appears to be making a distinction without a difference.  Whether in the account of Shasta or Tech Traders at the time of the freeze order, these funds are part of the receivership estate, they had already been invested in an illegal commodity pool, and if they remained in the Shasta account, it was merely fortuitous that they did so at the exact moment of the freeze.  There is no reason to give Triester the preferential treatment it seeks at the expense of the other investors."  Reply to Response to Motion [132] at 10.  The Court agrees with the Receiver and rejects TITC's argument that the funds were never at risk because they remained in the escrow account and could be traced to the account on the date of the freeze order.  The fact remains that TITC transferred the funds to Shasta and such funds were held in the Shimer escrow account before the freeze order.  As

17.  (...continued)
Agreement for Additional Subscription for an additional 1,000 member shares of Shasta Capital and remitted to Defendant Shimer another check for $100,000.00.  Id. at 3.  According to TITC, a deposit was made into the attorney escrow account on March 29, 2004, and the additional subscription funds were included in the deposit.  Id.  TITC asserts that the April 30, 2004 Citibank statement for the attorney escrow account shows that these additional subscription funds were maintained in the account on the date of the freeze order.  Id.  TITC contends in its brief that the funds maintained by Shasta in the escrow account were insulated from the activities of Tech Traders and were neither traded nor susceptible to being traded so long as they remained in the segregated account. See Memorandum in Support of Objection of Triester International Trading Corporation at 8-9.

with investor Corcoran, the funds were at risk as soon as they were deposited in Shasta's escrow account. Accordingly, for the same reasons that the Court has overruled Corcoran's objection, TITC's objection is likewise overruled.

James Roberts. Roberts objects to his investment being treated by the Receiver as a disallowed claim. Specifically, he asserts that he invested $150,000.00 with Dream Venture Group, LLC, c/o Gregg Amerman, and that his money was forwarded to Tech Traders. He seeks recovery of his entire investment less the amount he received from Tech Traders. Dream Venture Group has been listed on the disputed claims list by the Receiver. The Court finds that Roberts' objections do not relate to any specific issues raised in the proposed interim distribution and are overruled to the extent they contest the interim distribution. His objections shall be considered when the Court considers the disputed claims, and specifically when the Court reviews the Equity Receiver's objections to Certain Investor Claims.

Equity Financial Group, LLC [122]. The Equity Financial Defendants, through their counsel, object to the proposed interim distribution to the extent that any funds are distributed to ultimate beneficial owners who are not known, or in circumstances where the ultimate beneficial owner bears some responsibility for the losses sustained by investors. See Declaration of Paul M. Hellegers, Esquire [122] at ¶ 2. As set forth in Section 1, the

35

objection is resolved by the Receiver's proposal, approved by this Court, that no distributions be made to any party that fails to disclose to the Equity Receiver the natural person who will receive the funds.  Equity also objects to any distribution to the extent any preference is given to beneficial owners who invested or loaned money to Tech Traders or to Coyt Murray's other companies over investors who acquired interests through New Century, Edgar Holdings or Shasta.  Id. at ¶ 3.  The Court finds that the proposed interim distribution schedule does not make any such preference and therefore this objection is similarly moot.

In response, the Receiver states that with the exception of only three Shasta investor entities, the identities of all beneficial owners of claims on the Agreed Claims Interim Distribution Schedule have been disclosed, and that these investors could be placed on the Disputed Claims Interim Distribution Schedule until the information is disclosed to the Receiver.  Reply to Response to Motion [132] at 23.  For reasons set forth below, the Court agrees that until such time as the beneficial owner is disclosed, an entity should remain on the Disputed Claims Interim Distribution Schedule.  For purposes of the interim distribution motion, and for this reason, BPU Banca Populare Commercio, Industria International - claim 7 shall be placed on the Disputed Claims Interim Distribution Schedule.  This is so to be consistent with the treatment of all investors that the identities of all

36

beneficial owners be disclosed to the Receiver under oath.  In addition, the Receiver has stated that any claims "that suggest wrongdoing or misconduct by a claimant remain at this time on the Disputed Claims list." Id.  Accordingly, the objections by EFG are overruled.

　　　　Stable Absolute Return ("SAR") [118].  Citco Global Custody, N.V.  ("Citco")[18] - claim 16 was initially listed on the Receiver's proposed Approved Claims Interim Distribution Schedule, but subsequently was moved to the Disputed Claims Interim Distribution Schedule for failure to provide an amended claim form with the names of persons with a beneficial interest in claims. See Equity Receiver's Objections to Certain Investors [153] at 3. This claimant remains on the disputed claims list. Notwithstanding, SAR has also objected to the interim distribution, asserting that the $250,000.00 deposit made on April 1, 2004 by Citco should not be subject to pro rata distribution because Citco was not a customer at the time of the April 1, 2004 Court Order. Specifically, SAR asserts that Citco never received from Shasta a signed subscription agreement, nor did Shasta acknowledge receipt

---

18.  Stable Absolute Return Master, FOF, Ltd., filed through its attorney, a certification of Mark E. Ruddy in support of its objection to the proposed distribution.  In the certification, Ruddy states that Citco Global Custody N.V., a company incorporated under the laws of the Netherlands, assigned to Stable its rights and claims to the frozen funds which are the subject of the litigation.  See Certification of Mark E. Ruddy in Support of Objection to the Receiver's Proposed Partial Distribution to Stable Absolute Return Master, FOF, Ltd. at ¶¶ 2-3.

of SAR's funds. Certification of Mark E. Ruddy in Support of Objection to the Receiver's Proposed Partial Distribution to Stable Absolute Return Master, FOF, Ltd. [118] (hereafter "Ruddy Cert.") at ¶¶ 8-11. SAR argues that Citco specifically wired funds to Shasta with a condition precedent that Shasta's representatives would sign the proposed subscription agreement and relies upon the terms of the subscription agreement. Id. at ¶ 9. SAR further asserts that Citco's wiring of the $250,000.00 with a proposed subscription agreement and a request for price confirmation was nothing more than an offer to purchase an interest in Shasta's hedge fund and that no customer relationship was formed because Shasta never signed the subscription agreement, never confirmed the net asset value and therefore never accepted Citco's offer, and never received from Citco an acknowledgment of receipt of Shasta's disclosure document required by CFTC Regulation. Id. at ¶¶ 9-11. The Receiver asserts there "is no indication that Shasta either distributed a CFTC-required Disclosure Document or confirmed the net asset value of investments to any of its investors[.]" Reply to Response to Motion [132] at 11-12. After review of the submissions, the Court finds that the documents relied upon by SAR do not include any "condition precedent" regarding any need to sign the subscription agreement and confirm net asset value before the investment could become legally effective. Moreover, the Court finds that Shasta's failure to comply with certain CFTC regulations

38

does not in itself preclude the SAR funds from being considered as part of the receivership estate.  While SAR's arguments might lend support to a contractual rescission argument absent the Court order, once the Receiver was appointed, the issue before this Court is not a contractual issue between Citco and Shasta.  Rather, the issue here in equity is whether funds in the Defendants' accounts are subject to the freeze order.  The Court finds for the reasons set forth in Section 6 that funds in the Shasta escrow account prior to the freeze order are subject to the receivership estate, and specifically, to Shasta's distribution.

SAR also raises an objection to the extent that the Court's April 1, 2004 restraining order was entered before its funds were sent to the Shasta account at 12:33 p.m. EST on April 1, 2004, asserting that all funds received by Shasta after the freeze order should be refunded in full.  Ruddy Cert. at ¶ 12.  The attorney for the CFTC, Elizabeth Streit, has stated on the record during the hearing on March 4, 2005 that the order was entered after 4:00 p.m. EST that day.  The Court so finds and this objection is overruled.

Dr. Donald DiIenno [108, 135, 149].  DiIenno asserts that he invested a total of $790,000.00 in Tech Traders through Bally Lines, Ltd..  See Objection to the Agreed Claims Interim Distribution Schedule [108] at 4; see also Response to Reply of Stephen T. Bobo, Equity Receiver, to Objections to Motion for

Authority to Make Interim Distributions at 2. Of that amount, $400,000.00 was sent directly to Tech Traders (which is reflected in Tech Traders' bank records) and the other $390,000.00 he claims to have sent to Bally Lines, Ltd. in two payments – $100,000.00 on October 1, 2001 and $290,000.00 on May 22, 2002. Id. at 2-3. DiIenno has provided certain documents to the Receiver that he asserts support his transfer of $390,000.00 to Bally Lines, Ltd. He further claims that Bally Lines, Ltd. wired these funds to Tech Traders on or about those same dates. See id. Dr. DiIenno objects to his funds being "lumped together" with those of Bally Lines for purposes of the interim distribution, arguing that his status should not be "diluted" because other Bally investors received earlier returns from Tech Traders. See Response to Statement of Stephen T. Bobo, Equity Receiver, Regarding Categories of Objections to Interim Distribution Motion [149] at 2-3. However, for reasons set forth below in Section 3, to the extent DiIenno seeks tracing of his investment, this objection is overruled. Moreover, to the extent DiIenno objects to treatment as a Tier II investor and to the extent he seeks a plan that would provide direct distribution to all Tier II investors, without regard to withdrawals made by such investors' Tier I investor, such method is rejected. As noted by the Receiver, the "separate treatment of all Tier Two claims would likely increase the aggregate distribution amount [to these claimants] . . . [as] Tier Two investors who

40

received no withdrawals would receive a greater distribution if considered separately than if considered as part of the Tier One investor's claim[.]" Reply to Response to Motion [132] at 14. The effect, the Receiver asserts, would "necessarily dilute the amount available for all other claimants." Id. Moreover, other than Shasta, the other Tier I entities are in receivership. In addition, Tier II investors who assert that their Tier I entity improperly utilized their investment may seek relief against such Tier I entity. Similarly, if a Tier I investor is placed and remains on the Disputed Claim Schedule, its Tier II investors may seek legal recourse against such Tier I investors that are not receivership entities. Finally, as set forth below, the Court has determined that Shasta shall be treated as a Tier I investor for distribution purposes, and therefore, DiIenno's objection in this regard has been addressed by the modification of the proposed interim distribution plan. The Court finds that it is fair and equitable to calculate the claim amounts at the Tier I level. In this regard, the proposal by the Receiver that Tier I investors submit for advance approval the proposed allocation of distribution amounts to their corresponding Tier II investors further addresses the concern that Tier II investors not be tainted.

Consequently, DiIenno's objections are overruled. Distributions should be made calculated at the Tier I level in

accordance with the distribution plan and the Agreed Claims Distribution Schedule.

Robert Scott Batchelar [176]. This objector filed his objection well after the February 11, 2005 deadline and may be overruled on this basis. However, the Court will consider his objection. Batchelar asserts that Shasta did not involve a Ponzi scheme, as Shasta purportedly had a legitimate business practice and investors' funds were used to trade futures contracts as specified in the Shasta Private Placement Memoranda, whereas in Cunningham Ponzi had "no legitimate business practice and did not follow through with his investment vehicle." See Objection to Method of Interim Distribution [176] at 1. He thus argues that the case law refuting the use of the tracing method has been tied to Ponzi and pyramid schemes and that the tracing method should be reconsidered were the Court here to determine that Shasta was not a Ponzi scheme. Id. at 1-2. However, for the reasons set forth in section 3, this objection is overruled.

Sterling Entities [123, 165, 194]. The Sterling entities[19] initially filed objections to the interim distribution on February 11, 2005. Those objections are divided into three categories. First, Sterling objects to grouping the seven Sterling

_____

19. The Sterling entities include Sterling ACS, Ltd., Sterling Alliance Ltd., Sterling Casualty & Insurance, Ltd., Sterling Bank Limited, Sterling (Anguilla) Trust, Ltd., Sterling Investment Management, Ltd., and Strategic Investment Portfolio, LLC.

entities together for purposes of determining withdrawal deductions. See Memorandum in Opposition to Motion of Equity Receiver for Authority to Make Interim Distribution on Account of Investor Claims (hereinafter "Sterling Br.") at 2.  Second, Sterling objects to the Receiver not including in the proposed interim distribution the purportedly uncontested Sterling entities which Sterling asserts are Sterling Bank, Ltd., Sterling Casualty & Insurance, Ltd., Sterling Investment Management, Ltd., and Strategic Investment Portfolio. Id. at 9-10.  Third, Sterling objects to the interim distribution because it does not include the release of the funds held in Sterling (Anguilla) Trust's name at Man Financial. Id. at 2.  However, during a telephone conference on April 29, 2005, and again during an oral argument on May 13, 2005, Sterling agreed to reserve its third objection to be resolved at a later date in light of the Equity Receiver's representation that no funds held in Sterling (Anguilla) Trust's name were included in the interim distribution.  A hearing on this issue is scheduled for September 28, 2005.  Thus, for purposes of this motion, the Court will consider only the two other objections as to Sterling.

The CFTC also filed an objection to any distribution of funds to the Sterling entities until Sterling responds to certain discovery by the CFTC. See Objection of the Commodity Futures Trading Commission to the Claims of the Sterling Entities [150],

43

dated March 31, 2005. Initially, the CFTC demands production of a computer backup tape that the CFTC asserts belongs to Defendant Abernethy and further asserts is subject to the Court's prior restraining order, as well as certain bank records and the deposition of Vernice Woltz. Id. at 2. At a status conference on August 15, 2005, the CFTC withdrew the objection as it relates to the deposition of Vernice Woltz since that deposition occurred on August 9, 2005. The issue with regard to the backup tape shall be addressed in a separate Report and Recommendation and does not impact the interim distribution motion, as the Court, for the reasons that follow, overrules Sterling's objections, which at this time result in Sterling remaining on the Disputed Claims Schedule. The issue of the bank records is addressed infra.

The Receiver has asserted that the Sterling entities should be aggregated at this time until at least all deficiencies on the Sterling claim forms are addressed. Reply to Response to Motion [132] at 19. This treatment is consistent with the Receiver's proposal that accounts under common control or with joint beneficial ownership be aggregated for purposes of distribution. The basic equitable principal underlying such approach is that investors with more than one account do not receive a higher distribution percentage than single account investors. The Sterling entities are alleged by the Receiver to be under the common control of a small group of people "including

44

Howell Woltz and Vernice Woltz." <u>See</u> <u>id.</u>[20] Moreover, one of the reasons underlying the proposed aggregation is the Receiver's position that the Sterling entities' accounts with Tech Traders "show a number of transfers between them" and that "[n]ot all of the transfers are adequately documented[.]" <u>Id.</u> Moreover, the Receiver asserts that the Sterling entities have failed to disclose the identities of the ultimate beneficial owners of the invested funds or to provide any evidence that the ultimate beneficial owners authorized these inter-entity transfers. <u>Id.</u> For example, the Receiver asserts that "[i]n one case, transfers were made on Tech Traders' books from an account of one of the Sterling entities

---

20.  Specifically, the Receiver asserts that at the deposition of Howell Woltz, he testified "a small group of people control and own all the Sterling entities: Howell and Vernice Woltz, Fertina Turnquest, Samuel Currin, Joseph Brice, Hiram Martin, Thom Goolsby, Walt Hannen, Wendell Skeete and Lewis Borsellino. For example, Howell Woltz is the managing director and President of Sterling ACS Ltd., a director and President of Sterling (Anguilla) Trust, a director of Sterling Casualty & Insurance Ltd. and Sterling Bank Ltd., was the incorporator of Sterling Investment Management Ltd., is co-owner of Sterling Alliance Ltd. and signed the claim form submitted by Strategic Investment Portfolio LLC, which, he testified, does not exist but was Vernon Abernethy's 'idea.' Mr. Woltz also owns 30% of the stock of Sterling ACS Ltd., 9% voting stock of Sterling (Anguilla) Trust, 25% of Sterling Casualty & Insurance Ltd., 10-11% of Sterling Bank Ltd. and 100% of Sterling Alliance Ltd. with his wife, Vernice Woltz. Vernice Woltz is CFO of Sterling ACS Ltd., a director and President of Sterling (Anguilla) Trust, part owner of Sterling Bank Ltd. and co-owner of Sterling Alliance Ltd. One or both of the Woltzs, moreover, had signatory authority over all the domestic bank accounts known to be held in the names of the Sterling claimants for most of the life of those accounts and received the majority of monthly activity statements from the banks."  Reply to Response to Motion [132] at 19, n.7 (citing Declaration of Joy McCormack, attached hereto as Exhibit B, ¶¶ 8-9).

to an account of another Sterling entity without any actual funds supporting such transfers." Id. at 20.  In addition, the Receiver argues that the "Sterling entities themselves clearly treated the accounts as part of a unified group before the receivership" and the Receiver therefore proposes that any distribution be made to them as a unified group and only after all deficiencies in all the claim forms submitted by the Sterling entities are cured.  Id. at 19-20.  In response, Sterling argues that unlike the case where there are multiple accounts owned by single investors, here Sterling funds belong to "many 'depositors' with different interests."  See Response to Legal Issues Raised by the Equity Receiver's Objection to Claims [185] (hereafter "Sterling Response"), dated May 6, 2005, at 2.  Sterling also argues that "more than ninety percent (90%) of the funds belong to clients of the respective Sterling entities."  Id.  Specifically, Sterling's counsel asserts that "[t]he Sterling Entities are distinct companies, incorporated in different countries, with different licenses, different ownership and different clients whose money they invested with Tech Traders."[21]  See Sterling Br. at 4.  The

---

21.   In support, Sterling asserts "Sterling ACS Ltd. is a financial and corporate services provider organized and licensed pursuant to the laws of The Bahamas.  Sterling Alliance Ltd. is a company organized under the laws of the Bahamas.  Sterling Bank Limited is a Class One bank licensed in the nation of Saint Lucia. Sterling Casualty & Insurance Ltd. is a Class One insurance company licensed under British law in the territory of Anguilla.  Sterling Investment Management Ltd. is a company organized under the laws of
                                                              (continued...)

aggregation issue impacts that amount that each Sterling entity receives if distribution is made.  Specifically, Sterling asserts that under the proposed distribution methodology, the net distribution is $341,970.66 less than if the Sterling entities were each treated separately.  Id. at 6.  Moreover, Sterling asserts that aggregation as it relates to withdrawal is inappropriate.  For example, Sterling argues that in the case of Sterling Bank, more than $9 million dollars of the $9.177 million recognized by the Receiver was deposited by one client which made no withdrawals whereas Sterling (Anguilla) Trust – which Sterling asserts is comprised of funds belonging to different clients – deposited no money and made a net withdrawal of $100,000.00.  Sterling Response at 2.  Sterling argues that under the Receiver's aggregation theory, and looking at only these two entities, the burden of the entire $100,000.00 withdrawal would be shifted to other Sterling entities which did not withdraw funds.  Id.  Sterling also asserts that the Receiver's argument with respect to "inter-entity" transfers similarly is a "red herring."  Specifically, Sterling asserts that the "Receiver does not consider inter-entity transfers and simply reflect the total money deposited with Tech Traders by

21.  (...continued)
Anguilla.  Sterling Trust (Anguilla) Ltd. is a Class One trust company licensed under British law in the territory of Anguilla. Strategic Investment Portfolio LLC is a Delaware limited liability company."  Sterling Br. at 4-5.

each Sterling Entity." Id.  For example, Sterling asserts that Sterling Trust (Anguilla) Ltd.'s claim form provides that $250,000.00 was transferred on December 31, 2002 by Sterling (Anguilla) Trust to Tech Traders, but the Receiver disregards that transfer since the Receiver claims that Sterling Trust invested no funds in Tech Traders.  See SE-3-Sterling Trust (Anguilla) Ltd.'s Claim Form for Investors with Tech Traders, attached at Exhibit B2 to Declaration of Martin P. Russo, Esquire [195] (hereinafter "Russo Decl.").  Thus, Sterling asserts that since "the inter-entity transfer's [sic] were not recognized by the Receiver and documentation of the funds invested by each Sterling entity has been provided, the so called inter-entity transfers are irrelevant." Sterling Response at 3.

However, the Court has reviewed the claim forms submitted by the Sterling entities.  Clearly, by their own submissions, the Sterling entities had inter-company transfers that warrant, at least at this point, aggregation until such time as the Receiver's objections to Sterling are resolved in the Disputed Claims hearings.  In addition to the claims submitted above, the Court notes that Sterling Alliance Ltd.'s claim form (SE-1) alleges $250,000.00 in investment funds to Tech Traders from Sterling ACS, Ltd., and includes as distribution of funds a wire transfer of $65,000.00 to "Sterling ACS, Ltd. for Sterling Alliance, Ltd.," and a $250,000.00 Sterling Trust (Anguilla) Ltd. capital account

48

reflected as "[i]nternal transfer from account 5143 to 37927-A."
See Claim Form for Investors with Tech Traders, attached at Exhibit
B1 to Russo Decl.  Moreover, a number of the claim forms submitted
by the Sterling entities state that they were "aware of Tech
Traders through a related entity, Sterling Alliance Ltd." See SE-2
at ¶ 3; see also, SE-3 at ¶ 3; SE-4 at ¶ 3; SE-5 at ¶ 3; SE-6 at ¶
3; and SE-7 at ¶ 3.  Finally, as Sterling acknowledges, "some of
the owners and/or director of the Sterling entities overlap."
Sterling Br. at 5, n.3.  In light of this factor, and the
undisputed fact that one Sterling entity, Sterling Trust (Anguilla)
Ltd., received a withdrawal of $100,000.00 while it made no Tech
Traders cash investment, the Court finds that aggregation at this
time for purposes of the interim distribution motion is warranted.
Morever, Sterling's objection, the Court finds, does not serve as
a basis for rejecting the interim distribution.  However, as noted
above, the Court has set a September 28, 2005 hearing date for
certain claims on the Disputed Claim Schedule, including the
Sterling entities, the aggregation issue thereto, and the issues
concerning the Man Financial account.

       In addition, the Receiver argues that Sterling has not
provided certain relevant bank statements from Alliance Investment
Management, Ltd.. The Court notes that during the May 13, 2005
hearing, the Receiver and Sterling provided the following
stipulation: Alliance Investment Management is a Bahamian financial

institution that is unrelated to Sterling.  See Transcript of Proceedings at 73.  Apparently, Alliance was a financial intermediary in which some of the funds from Sterling entities came to Tech Traders.  Sterling asserts that it attempted to obtain documents from Alliance Investment Management but that the entity refused to provide the documents.  See Memorandum of Fact in Response to the Objection filed by the Receiver at 3; see also Transcript at 73.  At oral argument, Sterling's counsel acknowledged that no formal proceeding has been filed to obtain these records.  However, Sterling asserts that it has provided the wire instructions to Alliance, and that from the Tech Traders' accounts, the exact amounts were deposited into the Tech Traders' bank accounts from Alliance.  At oral argument, the Receiver stated that those wire transfers were handwritten pieces of paper and deemed by the Receiver as not worthy of reliance.  As Sterling has provided no further evidence that these statements cannot be obtained, and as the Receiver has required such records in accordance with the claims process, failure to supply these statement supports placement of Sterling at this time on the Disputed Claims Interim Distribution Schedule.[22]

---

22.  The Court notes the CFTC's objection to any distribution to Sterling for Sterling's failure to produce foreign bank records.  See CFTC's Reply to the Sterling Entities' Response to CFTC's Objections [169] at 11.  The CFTC does not specifically identify those bank records that have not yet been produced.  The Court notes that in its Memorandum of Fact in Response to the Objection
(continued...)

Sterling's second objection to the proposed interim distribution plan is that claims that are not objected in full are not considered for distribution as to the part of a claim to which the Receiver does not object. Sterling Br. at 8. Sterling argues that if interim distribution is made to some claimants to which there is no objection, so too must interim distribution be made to the uncontested parties of the Sterling entities' claims which Sterling's counsel claims comprises $5,155,666.00. Id. at 8-9. Specifically, Sterling asserts that there is no question raised as to disclosure of the beneficial owner of Sterling Investment Management, Ltd., Sterling Bank Limited, and Sterling Casualty & Insurance, Ltd.. Id. at 9-10. In addition, Sterling asserts that the Receiver has only raised a question on a $14,900.00 deposit as to Strategic Investment Portfolio and that this $14,900.00 could be discounted and the remaining amount of $263,778.00 invested should be subject to interim distribution. Id. at 10.

As to segregation of contested and uncontested parties, as the Receiver points out, the Receiver has treated each claim as

---

22.  (...continued)
Filed by the Receiver [194], Sterling asserts that the Receiver requested only account statements from the closed Sterling accounts formerly at Alliance Capital Management. Memorandum of Fact in Response to the Objection Filed by the Receiver [194] at 2. The Court has concluded that failure to produce these bank records serves as a basis for Sterling to be placed on the Disputed Claims Schedule. Thus, Sterling shall produce the records or the claims of Sterling, which at this time are aggregated, shall remain on the Disputed Claims Schedule.

a whole - that is, if a claimant has not provided adequate supporting information and documentation, the entire claim is placed on the Disputed Claims Interim Distribution Schedule. At this time, for the reasons set forth above, the Sterling entities' claims should be aggregated. Moreover, the Court finds as set forth below that beneficial owners must be disclosed to the natural person. The fact that one Sterling entity is placed on the Disputed Claims Interim Disbursement Schedule relegates all of the Sterling entities on that list. Thus, since the claims are aggregated and since two of the claimants have not supplied beneficial ownership information as required, this second objection to the interim distribution by Sterling is overruled.

The Court further notes that Sterling's argument that the Sterling entities should not be segregated, as well as the return of funds in the Man Financial account, will be considered in connection with the September 28, 2005 hearings on Disputed Claims.

## Resolution of Legal Issues With
## Regard to the Proposed Interim Distribution

### 1.   Legal Beneficial Owner.

Under the August 23, 2004 Order, investors must identify "the identity of all persons having a beneficial interest of any kind in their account with the Defendants." See Order dated August 23, 2004. As noted above, the Sterling claimants interpret this order to require disclosure of entities or persons who have a beneficial interest in their account, but not to require the

disclosure of "natural persons" who have an interest in the entities that hold a beneficial account. Specifically, Sterling asserts that it has disclosed all "persons" who have a beneficial interest in their account and that in some instances those persons are entities. Sterling argues that to require the second level of disclosure of those entities is contrary to the plain language of the order and disregards that corporations and other entities have a legal existence separate from their owners. Sterling relies on the general case law that a corporation and its shareholders are distinct entities, citing a number of cases including Dole Food Company v. Patrickson, 538 U.S. 468, 474 (2003), and Klien v. Bd. Of Tax Supervisors of Jefferson County, 282 U.S. 19, 24 (1930). Sterling also asserts that the Commodities Exchange Act does not support the Receiver's and CFTC's argument that natural persons are required to be identified with respect to entity investors. Arguing that the owners of an entity have an interest only in the entity and not an interest in the commodities account of the entity, Sterling asserts that no further disclosure is necessary. Sterling Response at 5.

Both the Receiver and CFTC assert that there are a number of reasons why the disclosure of the natural person of any entity claimant is required. First, they argue that in order to provide a fair and equitable distribution, it is important for the Receiver to know who invested the funds in Tech Traders and whether any of

such investors received funds back from Tech Traders or other entities that have been subject of the withdrawal approach. Specifically, the Receiver argues that "[i]n order to ensure that the ultimate recipients of the distribution are being fairly treated, the Receiver needs to take into account withdrawals previously made by natural persons, whether they made the withdrawals in their own names, as member of pools, or under the umbrella of a trust or corporate entity. Without disclosure of the ultimate beneficial owners of the claimants, the Receiver will not be able to determine a fair and equitable distribution for persons who may have beneficial interests in more than one claim or under more than one umbrella." See Equity Receiver's Reply to Sterling Entities' Response to Objections [171] at 2.

The Court notes that the term "person," as defined by the Commodities Exchange Act, "includes individuals, associations, partnerships, corporations, and trusts." 7 U.S.C. § 1(a)(28); see also 17 C.F.R. § 1.3(u). However, Sterling's argument that the Act does not require identification of natural persons does not warrant a finding that the Act precludes the Court from requiring, for the purposes of distribution of receivership assets, the disclosure of natural persons for investor corporate entities. In fact, the Court notes that a corporate entity may be disregarded under federal law "in the interests of public convenience, fairness, and equity[.]" SEC v. Elmas Trading Corp., 620 F. Supp.

54

231, 234 (D. Nev. 1985)(internal citations omitted), aff'd, 805 F.2d 1039 (9th Cir. 1986).  For example, in Elmas, the receiver sought to include in the receivership estate a number of entities that had commingled funds and intertwined operations to ensure that all assets were brought within the receivership estate for proper distribution to creditors.  Id. at 234-35.  The Court found based on a number of factors that the entities were not distinct and thus included them in the receivership.  See id. at 235-40.  While here the purpose for disregarding the corporate entity is to distribute assets from the receivership estate rather than to include such assets as was the case in Elmas, the Court finds that the same principles of equity and fairness apply to both analyses.  Were the Court not to include natural persons for the purpose of distribution, funds may unwittingly be distributed disproportionately in contravention of notions of fairness and equity.  Moreover, the Court notes that the August 23, 2004 Order specifically provides that claimants identify all persons with "a beneficial interest of any kind."  See Order dated August 13, 2004 at ¶ 2.  Consequently, the Court shall require disclosure of natural persons of investor entities, whether they provided funds in their own names as members of pools or under the umbrella of a trust, partnership, or corporate entity.

As noted above, Sterling has specifically objected to any requirement that natural persons be so disclosed.  As it relates to

Sterling, the Court notes the following:  Sterling acknowledges that it has not disclosed to the Receiver or the Court the natural persons holding beneficial interests in two of the Sterling entities.  Specifically, Sterling asserts, and the Receiver has acknowledged, that with respect to Sterling Bank, Ltd., Sterling Trust (Anguilla), Sterling Alliance, Ltd., Sterling Investment Portfolio, LLC and Sterling Casualty and Insurance, all of the natural persons who were beneficiaries have been disclosed in their claim forms.  However, with respect to Sterling ACS, Ltd., of the six alleged beneficial owners, two corporations have not yet fully identified the beneficial interests - Aquarius Holding and Security Fund, Ltd. - both of which Sterling asserts have registered addresses in Nassau, Bahamas, although at the time of the evidentiary hearing, Sterling was attempting to ascertain whether these owners would consent to disclosure.  With respect to Sterling Investment Management, Ltd., (Claim No. 74), Sterling's counsel asserts that the funds that were invested were invested on behalf of sixteen trusts and two companies (one of which has disclosed its owners).  However, Sterling further asserts that the trusts, although alleged Anguillan, were managed by Sterling Investment Management out of the Bahamas and that Bahamian law precludes disclosure.  Thus, Sterling asserts that foreign law precludes the disclosure of certain information.  In support, Sterling relies on a letter from Miriam J. Curling, apparently a Bahamian attorney,

which cites to a Bahamian Banks and Trust Companies Regulations Act (attached as exhibit W to Declaration of Martin P. Russo, Esquire [165]); and with respect to the Anguillan entities, Sterling refers to the Confidential Relationship Ordinance Act of 1981 (attached as exhibit BB to Declaration of Martin P. Russo, Esquire [165]). Finally, Sterling argues that some of the beneficial owners have agreed to disclosure subject to a confidentiality agreement limiting disclosure to the Receiver and that such disclosure should be sufficient. Sterling further asserts that the CFTC's argument in this regard is overreaching and that if the CFTC intends to name a Sterling entity as a relief defendant, it has had the power and ample opportunity to do so. With respect to the foreign law asserted by Sterling, the CFTC asserts that it is unclear that such law even applies to any of the Sterling entities, and even if it did, the fact remains that in this proceeding, Sterling would either have to obtain the permission of their clients to disclose the information to the CFTC or Receiver or be prepared to have their claims placed on the Disputed Claims Interim Distribution Schedule. See CFTC's Reply to the Sterling Entities' Response to CFTC's Objections ("hereafter CFTC Reply") at 3-4. Moreover, the CFTC asserts that with respect to the Anguillan Act, there is no prohibition to disclosure to government authorities. Id. at 5-6. Finally, the CFTC disputes the discovery abuse argument and asserts that in fairness to all claimants, and in particular in light of

the limited receivership estate, it is important to determine the actual recipient of funds to ensure that claimants are treated fairly and equally - both with respect to distributions and with respect to withdrawals. See id. at 13.

The Court concludes that all entity claimants, including Sterling, must provide a list of natural persons holding beneficial interests in the investor entity. Sterling has cited no case law that supports the argument that because an entity may be governed by certain foreign laws, this Court, in this proceeding, should relieve such entity from complying with the Receiver and the Court's requirement that certain information be disclosed. Moreover, even if the foreign law cited by Sterling precludes disclosure of natural persons of certain entities, Sterling has acknowledged that in some cases disclosure may be permitted if consent is obtained. In addition, Sterling has made no showing that it is unable to obtain appropriate legal relief from the disclosure requirements under the respective countries' laws. The Court agrees with the Receiver and the CFTC that an entity will have to decide whether to disclose the information required by the Receiver or be prepared to have the claims placed on the Disputed Claims Schedule.[23]

---

23. The Court notes Sterling's assertion that through counsel it has discussed with the Receiver a proposed methodology for granting the Receiver confidential access to the information. Memorandum of Fact in Response to the Objection Filed by the Receiver [194] at 2.
(continued...)

**2.   Claims Should be Recognized only for Actual Dollars Invested.**

The Receiver proposes that claims be recognized only for actual dollar amounts invested and proposes rejection of any claims for profits, interest or other earnings shown on investors' account statements.  Bobo Br. at 9.  In so proposing, the Receiver asserts that Tech Traders operations involved a "classic Ponzi scheme operation where relatively large gains were reported to investors even through the economic activities of the company actually resulted in large losses." Id. at 11.  The Receiver argues that as there were no actual gains, the Court should reject giving investors credit for such alleged gains.  Specifically, the Receiver argues that to "recognize such gains would cause recent investors (whose accounts had supposedly accrued little or no profits) to give up a share of the money they actually invested in order to fund a return of fictitious profits to earlier investors (whose accounts would have supposedly accrued relatively large profits)." Id. at 9-10.  In In re Tedlock Cattle Co., 552 F.2d 1351, 1353-54 (9th Cir. 1977), the Court specifically rejected an approach recognizing such gains.  In so ruling, the Tedlock Court found that a trustee of a bankrupt estate could utilize an "equity

_____

23.  (...continued)
However, at this time Sterling has not produced the list of natural persons to the Receiver.  In this regard, once Sterling has provided the list to the Receiver, the Court will entertain an application for a protective order, and at that time consider any objections or arguments to such protective order.

theory" in apportioning the assets to investor-creditors in a Ponzi investment scheme on the basis of restitution.  <u>Tedlock</u>, 552 F.2d at 1352.  Under the equity theory, or "cash-in-cash-out plan," investors receive a share of their original investment but do not recover paper "profits."  <u>Id.</u>  In this regard, "no investor creditor will receive the benefit of his bargain, but all will share some recovery."  <u>Id.</u>  Recovery of both "profits" and the original investment is deemed inequitable under this theory, as a claimant's original investment would be repaid at the expense of equally innocent later investors.  <u>Id.</u> at 1352-53.

The Court agrees that recognizing profits or other earnings in claims for distribution would be to the detriment of later investors and would therefore be inequitable.  Consequently, the Court adopts this approach utilized by the Receiver.  The Court further notes that no claimant has raised an issue with respect to this methodology.

### 3.    Claims Should Be Based Upon Pro Rata Distribution.

In his motion, the Receiver also has proposed a pro rata distribution to the claimants who hold allowed claims, all of whom are similarly situated.  Specifically, the Receiver asserts that similarly situated investors must be treated alike "so as to preserve equity and fairness."  Bobo Br. at 11.  In this regard, the Receiver rejected a tracing approach, where investors who put their funds in later and are able to trace their investments to

60

frozen funds recover such funds in full at the expense of earlier investors.  Arguing that most Courts of Appeals have rejected the tracing method, the Receiver contends that such an approach is arbitrary and inequitable and would permit "one defrauded claimant to recover at the expense of another merely because the former has the good fortune of being able to trace his or her funds[.]"  See SEC v. Credit Bancorp, Ltd., 194 F.R.D. 457, 463-64 (S.D.N.Y. 2000)(in denying motion for return of stock and dividends by investor defrauded in Ponzi scheme, Court noted that decisions authorizing pro rata distributions share "the basic rationale that it would be unjust to allow one defrauded claimant to recover at the expense of another, merely because the former has the good fortune of being able to trace his or her funds."); SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88-89 (2d Cir. 2002)(Court found no abuse of discretion by lower court's order treating all fraud victims alike and approving distribution plan based on pro rata method, finding use of such distribution "especially appropriate for fraud victims of a 'Ponzi scheme[.]'"); United States v. Real Property at 13328 and 13324 State Highway 75 North, 89 F.3d 551, 553-54 (9th Cir. 1996)(in SEC enforcement action, court affirmed decision to transfer proceeds from sale of forfeited property to fund to reimburse victims of fraud rather than tracing funds that were used to purchase property, citing district court's finding that "tracing fictions should not be utilized under circumstances

involving multiple victims and commingled funds."); United States v. Durham, 86 F.3d 70, 73 (5th Cir. 1996)(in "the interest of equity," court distributed funds to defrauded consumers pro rata despite fact that majority of funds could be traced to particular claimant); United States v. Vanguard, 6 F.3d 222, 226-28 (4th Cir. 1993)(holding that although rescission and restitution were appropriate remedies under contract principles, district court supervising equitable receivership in its discretion may deny such remedies "where the equities of the situation suggest such a denial would be appropriate."); SEC v. Elliott, 953 F.2d 1560, 1569 (11th Cir. 1992)(where investors "unwittingly transferred legal title in the securities" to fraudulent investment scheme, Court found district court did not abuse its discretion in disallowing tracing, finding that "it would not be equitable to give some [investors] preferential treatment in equity."); Ruddle v. Moore, 411 F.2d 718, 719 (D.C. Cir. 1969)(where different victims were defrauded at different times and money was commingled, court rejected rule in Clayton's Case allowing tracing because "it has nothing to be said for it as a principle governing conflicting claims to restitution by equally wronged parties.").

The Court agrees with the Receiver that the pro rata distribution methodology is appropriate. The Court has wide discretion in determining the appropriate form of relief in a receivership in equity. Elliott, 953 F.2d at 1569-70. The Court

also notes that the pro rata method "has been deemed especially appropriate for fraud victims . . . in which 'earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity.'" Credit Bancorp, 290 F.3d at 89 (internal citations omitted).  In rejecting the tracing method here, the Court finds that it would be inequitable to allow those claimants who are able to trace their funds to recover at the expense of other similarly situated claimants when such claimants are only able to trace their assets as a result of the "'fortuitous fact that the defrauders spent the money of other victims first.'" See Credit Bancorp, 290 F.3d at 89 (quoting Durham, 86 F.3d at 72).  To allow some claimants to recover to the exclusion of other victims would be "to elevate the position of those . . . [claimants] on the basis of the actions of the defrauders."  Durham, 86 F.3d at 72. The Court in Real Property similarly rejected the tracing method where the struggle over assets was between innocent parties, citing the Supreme Court's decision in Cunningham that "tracing fictions" should not be utilized in circumstances which involve multiple victims and commingled funds.  Real Property, 89 F.3d at 553.  Here, the events surrounding the fraud by Tech Traders involved numerous transactions and commingled funds of a number of unwitting investors who all expected a return on their investment from the same underlying trading activities.  Similarly, and for the same

63

reasons, the Court rejects tracing as it relates to the funds in the Shasta Escrow Account prior to the Court's April 1, 2004 Order, as the Court finds, as noted earlier, that the funds in this account were at risk as soon as deposited and Shasta did not place any funds in any other investments other than Tech Traders. The Court finds that equity demands that all victims of the fraud be treated equally and that the pro rata method would best protect all investors' interests here. See Durham, 89 F.3d at 553.

### 4. Withdrawals Should Be Treated on A Rising Tide Method.

The Receiver has proposed, after considering four alternatives, that the Court employ what has been previously designated by other Courts as the rising tide method for the treatment of withdrawals. See, e.g., Commodity Futures Trading Comm'n v. Hoffberg, No. 93 C 3106, 1993 WL 441984, at *2-3 (N.D. Ill. Oct. 28, 1993); Commodity Futures Trading Comm'n v. Skorupskas, No. 83-CV-1885DT (E.D. Mich. Aug. 22, 1988). Under this method, investors are permitted to retain previously received funds, but those withdrawals will be credited against the investors' respective pro rata shares calculated based on the full amounts invested. Under this proposal, distributions would be calculated according to the following formula: (actual dollars invested x pro rata multiplier) - withdrawals previously received = distribution amount. Only investors who have received less in withdrawals than their respective distribution amount will receive

funds.   Any investors whose withdrawals were in excess of their
respective distribution amounts would not receive any distribution
in the interim distribution plan.   In proposing this method, the
Receiver rejected three other alternatives (1) ignoring
withdrawals; (2) requiring that withdrawals be repaid to the
Receivership and then be redistributed through the distribution
process with all investors required to repay any withdrawals prior
to receiving any distribution; and (3) a net investment method in
which any withdrawals received by an investor are subtracted from
the total amount invested and the allowable claim is based on the
net amount.   See Commodity Futures Trading Commission v. Franklin,
652 F.Supp. 163 (W.D. Vir. 1986), rev'd on other grounds sub nom.,
875 F.2d 76 (4th Cir. 1989).

        The Court agrees with the Receiver that the rising tide
method is the most equitable.   Under this method, the Court finds
that as a result of crediting prior withdrawals, there will be more
funds available to the investors with allowable claims.   In
addition, this method does not penalize investors based on the
timing of their investments.

        Moreover, as pointed out by the Receiver, the first
method ignores the fact that an investor received payment for his
or her investment and would permit an investor to receive the same
percentage distribution for invested amounts with other investors
who received little or no previous payments.   The Court similarly

65

agrees that the last method - in which the Receiver requires all withdrawals to be repaid and then redistributed - is not cost effective and raises issues of collectibility.

Finally, the Court agrees that the net investment theory which would require the Court to subtract any withdrawals from an investor's total cash investment prior to calculating each investor's pro rata share, would result in certain investors receiving back more than such investor's proportionate share of investments. For this very reason, at least one court has rejected this approach. See Hoffberg, 1993 WL 441984, at *3. In fact, to illustrate the fact that under the net investment method, an investor who had already received a withdrawal receives a greater benefit at the expense of other investors, the Receiver, in his moving papers, provided an example utilizing an investment of $100,000.00 and a proposed interim distribution of 30 percent. See Bobo Br. at 17. Under the example, if there had been no withdrawals, under either method, the investor would receive $30,000.00, which is a total percentage return of investment of 30 percent. However, those investors who received previous withdrawals would, under the net investment method, receive funds from the Receiver even if their previous withdrawals exceeded 30 percent of the investment. For example, if an investor invested $100,000.00 and previously received $50,000.00 in withdrawals, he would receive nothing more under the rising tide method, but would

still receive funds under the net investment method - despite already having a percentage return of 50 percent.  Specifically, under the rising tide method, the investor would be viewed as having an allowed claim in the amount of $100,000.00.  Under this method, he will receive no additional distribution since he already received $50,000.00, which is greater than the $30,000.00 distribution that he otherwise would have been entitled to receive.  The total percentage return of his investment is 50 percent.  However, under the net investment method, the same investor's allowed claim would be $50,000.00 ($100,000.00 less the $50,000.00 previous withdrawal).  Then using the distribution method, the investor would receive a distribution of $15,000.00 ($50,000.00 x .30).  The end result is the second investor would receive a total of $65,000.00 and a percentage return of 65 percent.  The inequity of the net investment methodology is further demonstrated when comparing investors who received withdrawals of $20,000.00.  In the $20,000.00 example, under the rising tide method, Investor B receives a credit against his calculated distribution amount of $30,000.00 and therefore receives $10,000.00 with an investment percentage return of 30 percent.  However, under the net investment method, again, Investor B would be deemed to have an allowed claim of $80,000.00 ($100,000.00 less $20,000.00) and thus would receive a distribution in the amount of $24,000.00 ($80,000.00 x .30) plus retain the $20,000.00.  His total recovery would be $44,000.00, and

his total percentage return of the investment would be 44 percent.
Only where an investor has received no withdrawals will the net
investment method and the rising tide method result in the same
total percentage return of investment.   The Court agrees with the
Receiver that under the net investment method, investors who had
previously received funds as withdrawals "would benefit at the
expense of other investors by retaining the benefit of the full
amount of his withdrawal plus a distribution calculated on the
basis of net funds invested, rather than the recommended
distribution amount adjusted to take into account all amounts
already received."  See Bobo Br. at 16.   Consequently, the Court
finds the Receiver's method for treatment of withdrawals - the
rising tide method - is appropriate.

### 5.  Multiple Accounts of Single Investors.

The Receiver recommends that transactions by an investor
with ownership interests in more than one account in different
capacities be consolidated for purposes of determining the amount
of distribution.   Bobo Br. at 19.   For example, the Receiver
proposes that if an investor invested by way of an individual
retirement account and also directly, the withdrawals in one
account should be considered in determining the amount of total
distribution to the investor.   Id.   The Receiver asserts that not
to consolidate would permit an investor who used different
investment vehicles and received funds in one account to obtain a

disproportionately large distribution when compared to other single account investors.  The Court agrees with this proposal.

Claimant Paul McManigal objects to this treatment and asserts that his two accounts should be treated separately or otherwise he will suffer an undue hardship.  The Court overrules this objection.  In fact, due to the withdrawals made by this claimant prior to the freeze order, this claimant received more than the proposed interim percentage distribution.  Specifically, McManigal maintained two accounts individually in the amount of $100,000.00 and in an IRA in the amount of $366,000.00.  He withdrew on April 1, 2004 the amount of $366,000.00.  Consequently, as a result of the proposed consolidation treatment, he is not entitled to receive any funds from his $100,000.00 investment, since under the formula proposed, his withdrawals exceed his gross distribution amount.  [$466,000.00 [actual dollars invested] x .38 [pro rata multiplier] = 177,080 - 366.000 (withdrawals) = 0].  The Court finds that to disregard consolidation would permit this investor to receive a disproportionally larger distribution to those investors who maintained single accounts.

The Court further finds that it is immaterial whether McManigal's wife maintained, as he asserts, a one-half interest in his IRA under California community property law.  If it is accepted, as pointed out by the Receiver, McManigal would still have received as withdrawals more than distribution amount.

Specifically, McManigal's share of the $366,000.00 IRA would be $183,000.00, his total investment amount would be $283,000.00 ($183,000.00 plus $100,000.00), his withdrawal would be $183,000.00 which exceeds the distribution amount of $107,540.00 (.38 x $283,000.00).  This objection is overruled.

6.    **Shasta in the Aggregate Should be Treated as a Tier I Investor.**

As set forth above, there are two ways proposed by the Receiver to treat Shasta Tier II Investors.  Under the initial proposal by the Receiver, investors of Shasta would receive their pro rata distributions based upon their individual claims whereas investors of other Tier II entities are consolidated for determining the amount of pro rata distribution.  The reasoning behind this different treatment is based primarily upon the fact that Shasta is a receivership entity.  The second approach treats Shasta investors as other Tier II investors; that is, Shasta would receive a pro rata distribution from Tech Traders and then in turn would make its pro rata distribution to Tier II investors.

Having considered both proposals, the Court finds that the second method, on balance, is more acceptable as it places all investors in Tier II in the same position.  As a result, Shasta, which invested $14,363,658.20 in Tech Traders would receive 38 percent gross distribution amount on that claim, which equals $5,458,190.12 for distribution to Agreed Claims.  The net distribution amount would be $3,844,332.12, which is the gross

amount less the $1,613,858.00 Tech Traders previously repaid to Shasta.  As a result of this approach, the Receiver will make net distribution amounts to Shasta investors from this amount.  In addition, as Shasta is treated under this approach as a Tier I investor, the $426,000.00 in funds in the Shasta escrow that never was transferred to Tech Traders, and in which the Receiver currently maintains in a separate escrow account, should be combined to this amount.

In addition, the Court finds that the New Century Trading distribution determination should be made at the New Century Tier I level.  However, regardless of either treatment, the Tier II investors of New Century would not receive any distribution because of the amount of withdrawals to New Century.

In so approving treatment of Shasta as a Tier I investor, the Court finds that the amount of funds in the Shasta escrow account before the freeze order shall be used as part of the overall distribution to Shasta investors.  In doing so, the Court, however, rejects Zinman's approach to trace the escrow amounts to individual investors for the reasons set forth in Section 3.  As pointed out by the Receiver, such an argument "rests upon the presumption that defendants intended to convert victims' funds in the order in which they were deposited into defendant's accounts." Reply to Response to Motion [132] at 8.  Moreover, even if this approach was used, based on the spreadsheet for the relevant time

71

period, Zinman's investment would have been converted prior to other investors in Shasta.[24]  Zinman's objections if sustained would favor him over other victims of the Defendants' activities. Consequently, the Court agrees with the Receiver that the Shasta investors whose investments at the time of the freeze order were in the Shimer escrow account be treated on a pro rata distribution as part of the Shasta distribution receivership funds.  This treatment is consistent with the Court's rejection of tracing in general as set forth in Section 3.  In this regard, the objection of Zinman is rejected.

### 7.  Investments after the April 2004 Order.

The Receiver proposes that any funds deposited into the Shasta or Tech Trader accounts after the April 1, 2004 Order of the Court should be returned to the investors and not made a part of the Receivership assets.[25]  The Court agrees as the Court finds that

---

24.  The Receiver has included in his reply a spreadsheet based upon the March 31, 2004 and April 30, 2004 statements for the Robert W. Shimer Escrow Account, Shasta Capital Associates sub account, maintained at Citibank, N.A. and specific wire transfer advices relating to this account.  The spreadsheet summarizes the activity in the account from March 26, 2004 through April 7, 2004. See Affidavit of Stephen T. Bobo in Support of Reply to Objections to Motion for Authority to Make Interim Distribution dated February 25, 2005 at ¶ 6.

25.  The April 1, 2004 freeze order provides in part:  "Defendants Equity Financial Group LLC, Tech Traders, Inc., Vincent J. Firth and Robert W. Shimer, and all persons insofar as they are acting in the capacity of their agents, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with them who receive actual notice of such order by
(continued...)

such an approach is consistent with the Court's Order, and as the Receiver asserts, "the general purpose of a freeze order, which is to 'maintain the status quo and prevent additional losses to customers.'" Bobo Br. at 21 (citing Anderson v. Stephens, 875 F.2d 76, 78 (4th Cir. 1989)).  There is one specific exception to this approach based upon an investor's alleged source of funds and claims and setoff rights by the Receiver. This investor, Dr. Marsha Green, deposited funds with Shasta on April 2, 2004, and whether she will be entitled to recoup those funds under this process will be determined when the Court considers the Receiver's specific objections and her responses at the hearing scheduled for September 28, 2005.

### 8.   Allocation of Distribution of Funds.

The Receiver further recommends that "an authorized representative of each investment group be required to submit to the Receiver a proposed means of allocating the distribution funds among those having a beneficial interest in the funds." Bobo Br.

---

25.  (...continued)
personal service or otherwise, shall be prohibited from directly or indirectly: Withdrawing, transferring, removing, dissipating or disposing of funds, assets or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control, or in the name of the Defendants including, but not limited to, any accounts in the name of or under the control of Shasta Capital Associates LLC." See Statutory Restraining Order and Order Appointing Receiver [6] at 2-3.

at 24. The Receiver will then review the proposed allocation and upon approval release the investment group's share of interim distribution. If there are disputes among the members of the investment group, the Receiver proposes that the disputes be resolved by the Court. The Court also agrees with this process. The Receiver proposes and the Court agrees that when an investor consists of a number of beneficial owners, for purposes of distribution, the account will be deemed owned in equal shares unless another ownership method is proven through the claims process discussed below.

### 9. Ultimate Distribution.

Finally, the Court notes that based upon the above resolution, a revised interim distribution plan should be submitted that takes into account the issues decided herein. The Receiver shall file a revised interim distribution schedule reflecting the Court's rulings. The revised interim distribution schedules shall list Shasta as a Tier I investor and shall include a Shasta interim schedule. In addition, the interim schedule shall include the amount to be distributed to each investor.

I am filing this Report and Recommendation with the Clerk of the Court and sending a copy of same to all counsel of record. Any objections to this Report and Recommendation must be filed within ten (10) days of service pursuant to L. Civ. R. 72.1(c)(2)

74

and Fed. R. Civ. P. 72(b).

Dated: September 2, 2005          s/ Ann Marie Donio
                                 ANN MARIE DONIO
                                 United States Magistrate Judge


cc:  Hon. Robert B. Kugler
     (See Attached Service List)

## <u>Service List</u>

Commodity Futures Trading Commission v.
Equity Financial Group, LLC, et al.
Civil No. 04-1512

Elizabeth M. Streit, Lead
 Trial Attorney
Commodity Futures Trading Commission
525 W. Monroe St., Suite 1100
Chicago, IL 60661

Stephen T. Bobo - Receiver
Sachnoff & Weaver, Ltd.
10 S. Wacker Drive
Chicago, IL 60606

Lewis B. Cohn, Esq.
Witman, Stadtmauer & Michaels, P.A.
26 Columbia Turnpike
Florham Park, NJ 07932
(Equity Financial Group, LLC)

Cirino M. Bruno, Esq.
Martin H. Kalplan, Esq.
Melvyn J. Falis, Esq.
Gusrae, Kaplan, Bruno
 & Nusbaum, PLLC
120 Wall Street
New York, NY 10005
(Tech Traders, Inc.)

Vincent J. Firth
3 Aster Court
Medford, NJ 08055

Robert W. Shimer
1225 W. Leesport Rd.
Leesport, PA 19533

Alison Shimer
1225 W. Leesport Road
Leesport, PA 19533

J. Vernon Abernethy
413 South Chester St.
Gastonia, NC 28052

Merrill N. Rubin, Esq.
85 Eldridge Street, 1st Floor
New York, NY 10002
(Nancy Omaha Boy)

Nancy Omaha Boy
509 Carsonia Avenue
Reading, PA 19606

Deanna L. Koestel, Esq.
Norris, McLaughlin & Marcus
721 Route 202-206 North
P.O. Box 1018
Somerville, NJ 08876
(Marsha L. Green and Thomas E. List)

Marsha L. Green
175 Hawthorne Court
Wyomissing, PA 19610

Thomas E. List
920 Imperial Drive
Mohnton, PA 19540

ICC Finance Corporation
Attn: Shlomo Bitensky
41 Hasbalom Street
Raanana, Israel 43561

Dr. Jeffrey Marrongelle
Barbara Marrongelle
113 Pine Creek Road
Orwigsburg, PA 17961

Bally Lines, Ltd.
C/o Dr. Edward J. Evors
720 W. Orient Street
Tampa, FL 33603

Warren W. Faulk, Esq.
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
(The Sterling Entities)

Steven E. Corcoran
13015 Robleda Road
Los Altos Hills, CA 94022

Donald A. DiIenno, MD
1624 Sharon Way
Clearwater, FL 33764

Paul G. McManigal
16 Inverness Lane
Newport Beach, CA 92660

James Roberts
201 Thompson Lane, Suite 200
Nashville, TN 37211

Stephen M. Russo, Esq.
Stephen M. Russo, P.C.
27 North Broad Street
Ridgewood, NJ 07450
(Stable Absolute Return Master, FOF, Ltd.)

Joshua M. Bernstein, Esq.
Abrahams, Loewenstein & Bushman, P.C.
Three Parkway, Suite 1300
Philadelphia, PA 19102
(Triester International Trading Corporation)

J.R. Nerone, Esq.
19358 Blythe Street
Reseda, CA 91335
(Don Zinman)

R. Scott Batchelar
234 Kenrick Street
Newton, MA 02458

[Doc. No. 100]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
HONORABLE ROBERT B. KUGLER

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | Civil No. 04-1512-RBK-AMD |
| v. | |
| EQUITY FINANCIAL GROUP, LLC, et al., | |
| Defendants. | |

**ORDER**

THIS MATTER having been brought before the Court by way of motion of Stephen T. Bobo (the "Receiver"), the Equity Receiver for Equity Financial Group, LLC, Tech Traders, Inc., Tech Traders, Ltd., Magnum Investments, Ltd., Magnum Capital Investments, Ltd., Robert W. Shimer and Vincent J. Firth, for authority to make an interim distribution on account of investor claims. Notice of the motion was served on all known investors of the Defendants, as well as on the parties to the case. The Court having considered the motion and papers filed in support of it, as well as the objections received to the motion, as well as the Report and Recommendation submitted by the Honorable Ann Marie Donio, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C); and the Court having made a de novo review; and for good cause shown:

IT IS on this _____ day of September, 2005

**ORDERED** that the Report and Recommendation is **ADOPTED**; and it is further

**ORDERED** that the proposed interim distribution is **GRANTED** as modified below, and the objections to the interim distribution are ruled upon as follows:

1. The objections of the following claimants are overruled to the extent they contest the interim distribution: (a) Marsha Green [119]; (b) Thomas List [117]; (c) Alison Shimer [116]; (d) Nancy Omaha Boy [129]; (e) Jeffery and Barbara Marongelle [126]; (f) James Roberts. The objections by these claimants as to their placement on the Disputed Claims Interim Schedule shall be determined by the Court in accordance with the Schedule set by the Court by Order dated August 18, 2005.

2. The objections of the following claimants are overruled: Paul McManigal [125]; Steven Corcoran [115]; Triester International Trading Corp. [127]; and R. Scott Batchelar [176].

3. The objection of plaintiff, Commodity Futures Trading Commission ("CFTC")[121] to place Quest For Life's claim on the Disputed Claims Interim Distribution Schedule is sustained.

4. The objections of ICC Finance Corporation [124] are overruled.

5. The objections of Don Zinman [120, 134] are overruled.

6.   The objections by Equity Financial Group, LLC [122] are dismissed as moot.

7.   The objections of Stable Absolute Return [118] are overruled.

8.   The objections of Donald DiIenno [108, 135, 149] are overruled in part and dismissed as moot in part with respect to treatment of Shasta as a Tier I investor.

9.   The objections of the Sterling entities [123, 165, 194] as they relate to the interim distribution are overruled. Sterling shall be provided a hearing on the issue of aggregation in connection with resolution of the Disputed Claims.  Sterling has reserved its objection on the ground that the proposed distribution does not include the release of the funds held in Sterling (Anguilla) Trust's name at Man Financial.

**IT IS FURTHER ORDERED** that entity investors must disclose the identity of all persons having a beneficial interest of any kind in the investor entity as set forth in the Report and Recommendation.  For this reason, BPU Banca Populare Commercio Industria International - claim 7 shall be placed on the Disputed Claims Interim Distribution Schedule.

**IT IS FURTHER ORDERED** that for purposes of the interim distribution, Shasta Capital Associates, LLC shall be treated as a Tier I investor as set forth in the Report and Recommendation.

**IT IS FURTHER ORDERED** that the Receiver is authorized to make an initial distribution of thirty-eight percent (38%) of allowed investor claims from receivership funds.

**IT IS FURTHER ORDERED** that the Receiver shall determine the interim distribution amount for each claim in the following manner:

1. Only actual amounts invested with the Defendants shall be included in allowed claims. Claims based on profits, interest, or other accruals reported by the Defendants shall not be allowed;

2. Multiple accounts in which an investor has a beneficial interest shall be consolidated to the extent of such beneficial interest for purposes of distribution;

3. Each investor holding an allowed claim shall receive a thirty-eight percent (38%) pro rata distribution from the funds of Defendant Tech Traders, less any distributions previously received;

4. The interim distribution amount for each claim shall be calculated first by multiplying the total amount invested by thirty-eight percent (38%). This results in each investor's gross pro rata distribution amount (the "Gross Distribution Amount");

5. From each investor's Gross Distribution Amount, the total of all withdrawal amounts already received by that investor on account of its investments with the Defendants is then subtracted. This difference, the "Net Distribution Amount," is the

amount that the Receiver is authorized to distribute on account of allowed claims; and

6. The Receiver will reserve the Net Distribution Amount for claims that have not yet been determined to be allowable. Should this Court determine that some or all of an investor's claim amount should be disallowed, then the Receiver shall distribute the Net Distribution Amount corresponding to the portion of the claim which was allowed and shall transfer the Net Distribution Amount corresponding to the disallowed portion of that claim from reserved funds back to general receivership funds.

**IT IS FURTHER ORDERED** that the Receiver shall file a revised interim distribution schedule consistent with this Order.

**IT IS FURTHER ORDERED** that sufficient funds be reserved from the interim distribution in the event the Court consolidates the Magnum investors in this action.

**IT IS FURTHER ORDERED** that where claims are submitted on behalf of groups of investors or entities through which multiple persons have invested with the Defendants, the Receiver shall approve how such investment groups or entities allocate among their members the distributions that they receive from the receivership estate. An authorized representative of each such group of investors or entity shall submit to the Receiver a proposed means of allocating distribution funds among those having a beneficial interest in the funds. Upon review and approval of the proposed allocation, the Receiver will release the Net Distribution Amount

for that investment group.  Within forty-five (45) days after the distribution is received by the respective investment group, the authorized representative of that investment group shall submit to the Receiver a declaration under oath attesting to the manner in which the investment group actually allocated the distribution funds among its members, along with copies of the checks or other documents showing the disbursements made to the members.

**IT IS FURTHER ORDERED** that any funds deposited into Shasta or Tech Traders accounts after the April 1, 2004 order shall be returned.

**IT IS FURTHER ORDERED** that the Receiver is authorized and directed to return the following amounts invested with Shasta after the entry of the April 1, 2004 restraining order which froze the Defendants' accounts: Michael Duff - $200,000.00; Jolin Investments - $100,000.00; and Broadtree Reinsurance Company, Ltd. - $150,000.00.  The Receiver shall continue to hold the $47,000.00 invested by Dr. Marsha Green on April 2, 2004 until this Court can determine the Receiver's objections to and set off rights against her claim.

_____
ROBERT B. KUGLER,
UNITED STATES DISTRICT JUDGE

cc:  See Attached Service List

## <u>Service List</u>

Commodity Futures Trading Commission v.
Equity Financial Group, LLC, et al.
Civil No. 04-1512

Elizabeth M. Streit, Lead
 Trial Attorney
Commodity Futures Trading Commission
525 W. Monroe St., Suite 1100
Chicago, IL 60661

Stephen T. Bobo - Receiver
Sachnoff & Weaver, Ltd.
10 S. Wacker Drive
Chicago, IL 60606

Lewis B. Cohn, Esq.
Witman, Stadtmauer & Michaels, P.A.
26 Columbia Turnpike
Florham Park, NJ 07932
(Equity Financial Group, LLC)

Cirino M. Bruno, Esq.
Martin H. Kalplan, Esq.
Melvyn J. Falis, Esq.
Gusrae, Kaplan, Bruno
 & Nusbaum, PLLC
120 Wall Street
New York, NY 10005
(Tech Traders, Inc.)

Vincent J. Firth
3 Aster Court
Medford, NJ 08055

Robert W. Shimer
1225 W. Leesport Rd.
Leesport, PA 19533

Alison Shimer
1225 W. Leesport Road
Leesport, PA 19533

J. Vernon Abernethy
413 South Chester St.
Gastonia, NC 28052

Merrill N. Rubin, Esq.
85 Eldridge Street, 1st Floor
New York, NY 10002
(Nancy Omaha Boy)

Nancy Omaha Boy
509 Carsonia Avenue
Reading, PA 19606

Deanna L. Koestel, Esq.
Norris, McLaughlin & Marcus
721 Route 202-206 North
P.O. Box 1018
Somerville, NJ 08876
(Marsha L. Green and Thomas E. List)

Marsha L. Green
175 Hawthorne Court
Wyomissing, PA 19610

Thomas E. List
920 Imperial Drive
Mohnton, PA 19540

ICC Finance Corporation
Attn: Shlomo Bitensky
41 Hasbalom Street
Raanana, Israel 43561

Dr. Jeffrey Marrongelle
Barbara Marrongelle
113 Pine Creek Road
Orwigsburg, PA 17961

Bally Lines, Ltd.
C/o Dr. Edward J. Evors
720 W. Orient Street
Tampa, FL 33603

Warren W. Faulk, Esq.
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
(The Sterling Entities)

Steven E. Corcoran
13015 Robleda Road
Los Altos Hills, CA 94022

Donald A. DiIenno, MD
1624 Sharon Way
Clearwater, FL 33764

Paul G. McManigal
16 Inverness Lane
Newport Beach, CA 92660

James Roberts
201 Thompson Lane, Suite 200
Nashville, TN 37211

Stephen M. Russo, Esq.
Stephen M. Russo, P.C.
27 North Broad Street
Ridgewood, NJ 07450
(Stable Absolute Return Master, FOF, Ltd.)

Joshua M. Bernstein, Esq.
Abrahams, Loewenstein & Bushman, P.C.
Three Parkway, Suite 1300
Philadelphia, PA 19102
(Triester International Trading Corporation)

J.R. Nerone, Esq.
19358 Blythe Street
Reseda, CA 91335
(Don Zinman)

R. Scott Batchelar
234 Kenrick Street
Newton, MA 02458