IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
HONORABLE ROBERT B. KUGLER

COMMODITY FUTURES TRADING
COMMISSION,                                  :
                                             :
                                             :
            Plaintiff(s),                    :
                                             :
            v.                               :        Civil No.  04-1512(RBK)
                                             :
EQUITY FINANCIAL GROUP LLC, et al,           :
                                             :
            Defendant(s).                    :
                                             :
_____     :

**O P I N I O N**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Plaintiff") alleges that Defendants Vincent Firth, Robert W. Shimer, and Equity Financial Group LLC ("Equity") committed multiple violations of the Commodity Exchange Act and CFTC regulations.  The allegations in the complaint include claims that Defendants violated 7 U.S.C. § 4b(a)(2) by committing fraud by misrepresentation.  CFTC also alleges violations of 7 U.S.C. § 6*o*(1), commodity pool fraud, and alleges that Equity was responsible for Shimer and Firth's commodity pool fraud and vice versa.  CFTC alleges failure to register as a commodity pool operator or commodity trading advisor and that Shimer and Firth aided and abetted Equity's violation on this count.  CFTC claims that Shimer and Firth failed to register as associated persons ("APs") of the commodity pool operator.  Finally, CFTC alleges that Shimer impermissibly accepted and traded third party funds in the name of Tech Traders, the commodity trading advisor, in violation of 17 C.F.R. § 4.30.

The Court has previously ruled that defendant Shasta was a commodity pool, initially in the opinion at Commodity Futures Trading Comm'n v. Equity Fin. Group, No. 04-1512, 2005 WL 2864784 (D.N.J. Oct. 4, 2005) and on reconsideration, Commodity Futures Trading Comm'n v.

Equity Fin. Group, No. 04-1512, 2006 WL 3359418 (D.N.J. Nov. 16, 2006).  The Court ruled that Shasta satisfied the four-factor test for a commodity pool, as articulated in Lopez v. Dean Witter Reynolds, Inc., 805 F.2d 880, 883 (9th Cir. 1986), because (1) the funds of individual investors were pooled in defendant Shimer's equity account; (2) these commingled funds were then transferred en masse to Tech Traders to be invested in commodity futures, without distinguishing between the funds of individual investors; (3) investors believed that gains from the Tech Traders operation would be allocated pro rata, depending on the relative amount of their investment; and (4) trades were made on behalf of the pool rather than in the name of individual investors.

The Court previously granted summary judgment on a number of other counts of Plaintiff's complaint in the opinion at Commodity Futures Trading Comm'n v. Equity Fin. Group, No. 04-1512, 2006 WL 3751911 (D.N.J. Dec. 18, 2006).  The Court ruled that Equity violated 7 U.S.C. § 6m(1) because Equity, acting as an unregistered CPO, used instrumentalities of interstate commerce, i.e., the telephone, in connection with its business.  Because the Court concluded that Shasta was a commodity pool and Equity a commodity pool operator, and because Plaintiff presented evidence that defendants Firth and Shimer acted as salespeople for Equity, the Court ruled that Defendants Firth and Shimer violated 7 U.S.C. § 6k(2) by failing to register with the CFTC as associated persons ("APs").  Regarding Plaintiff's allegations under 7 U.S.C. § 6 o(1)(b), the Court concluded that, given the nature of the fiduciary relationship Firth had with Shasta investors, the uncontroverted evidence that he intended to make misleading representations to potential Shasta investors when he signed and distributed the PPM via e-mail and posted the "verified" performance numbers on the Shasta website, and the finding that the PPM had the effect of defrauding or deceiving potential investors, Firth violated 7 U.S.C. § 6o(1)(B).  The court also concluded that Shimer violated this provision because he had a fiduciary relationship with Shasta's investors, intentionally ignored the numerous and varied warning signs regarding Tech Traders and Murray, used the internet to post the PPM as well as unverified performance numbers on the Shasta website, and communicated with the CPAs, potential investors, and Murray via e-mail.  The Court ruled that

because these violations were all committed while defendants Firth and Shimer acted as agents of Equity, Equity is liable for the foregoing charges against Firth and Shimer under 7 U.S.C. § 2(a)(1)(B).

The Court has also ruled that Tech Traders was a commodity trading advisor ("CTA"), that it violated 17 C.F.R. § 4.30 by accepting money from third parties and trading those funds in Tech Trader's name, and that Shimer aided and abetted this violation of section 4.30. Commodity Futures Trading Comm'n v. Equity Fin. Group, No. 04-1512, 2007 WL 1038754, (D.N.J. March 30, 2007).

There are three remaining issues. The first is whether defendants Firth, Shimer and Equity committed fraud by misrepresentation under 7 U.S.C. § 6b(a)(2) in misrepresenting and failing to disclose material information about their expertise, qualifications, background, compensation, and their experiences in dealing with Coyt Murray and Tech Traders; recklessly misrepresenting the performance of the Shasta commodity pool and the role of the independent CPA; and accepting disbursements to which they were not entitled. The second issue is whether defendants Firth and Shimer are liable for Equity's violations of the Act, pursuant to 7 U.S.C. § 13c(b), because Firth and Shimer "directly or indirectly controlled Equity and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Equity's violations" of the Commodity Exchange Act. In connection with the failure to register as a commodity pool operator count, the remaining issue is whether defendant Shimer aided and abetted Equity's previously-determined failure to register as a CPO under 7 U.S.C § 6m(1).

The Court, without a jury, held a trial on these issues on August 27, 28, 29, 30, and 31 and September 4, 5, and 6, 2007. On November 6, 2007, Plaintiff filed Proposed Findings of Fact and Conclusions of Law, together with a Supplemental Post Trial Brief. Shimer submitted "Proposed Findings of Fact and Conclusions of Law and Post Trial Brief."[1] Firth submitted

---

[1] Those sections of Shimer's papers which reargue earlier rulings of this court have been ignored.

"Proposed Findings of Fact and Conclusions of Law."[2]  Though Equity was represented, the Court excused its obligation to file anything further.

The following, pursuant to Federal Rule of Civil Procedure 52, represents the Court's Findings and Conclusions.  As will be demonstrated, plaintiff clearly sustained its burden of proof and is entitled to the judgments it seeks against all defendants.

## THE PARTICIPANTS

1.      Defendant Equity Financial Group, LLC, ("Equity") is a New Jersey limited liability company formed on September 1, 1998, with an address of 3 Aster Court, Medford, New Jersey 08055.  (Answer ¶1; Stip. Fact 4).  Equity was the manager of Shasta Capital Associates, a Delaware limited liability company.  (Stip. Fact 4.)

2.      Defendant Vincent J. Firth ("Firth") resides in Medford, New Jersey and is the President and sole shareholder of Equity.  (Answer ¶1; Stip. Fact 2.)

3.      Defendant Robert W. Shimer ("Shimer") resides or resided in Leesport, Pennsylvania and was legal counsel for Shasta and Equity at all relevant times.  (Answer ¶¶ 1, 31; Stip. Fact 3.)

4.      The Court has already ruled that Shasta was a commodity pool.

5.      Shasta's funds, except for 1% of initial deposits, all went into Tech Traders' master pool.  (Trial Tr., Shimer, 8/28/07, 93-4 to 9.)

6.      The Court previously ruled that Equity was the commodity pool operator ("CPO") for Shasta.

7.      New Century Trading LLC ("New Century"), is a Nevis, West Indies limited liability company whose manager was Allied International Management, Ltd.  (Stip. Fact 5.)

---

[2]Firth attached "Closing Remarks" in which he agrees there were "mistakes" made and "red flags missed" but denies these "mistakes" were "intentional" or "fraudulent."

8.     New Century was formed by an attorney by the name of Liburd on the Island of Nevis, West Indies, in April of 2001, at the direction of Shimer.  Shimer suggested the formation of this entity to permit accredited foreign investors to invest in Tech Traders.  New Century had two investors, International Investment Alliance and Metalchem.  Later, Shimer formed Shasta as a Delaware Limited Liability Company.  (Stip. Fact 34.)

9.     Edgar Holding Group, Inc. ("Edgar") was a Delaware corporation formed in December, 2000, of which Firth was president and Shimer was the chief financial officer.  Edgar collected at least $180,000, in funds from four outside investors to invest with Coyt E. Murray. (Stip. Fact 6.)

10.     Tech Traders, Inc. ("TTI") was a Delaware corporation located in Gastonia, North Carolina.  (Stip. Fact 7.)

11.     Tech Traders, Ltd. ("TTL") was a foreign corporation organized under the laws of the Bahamas.  It was a sister company to Tech Traders, Inc. and was party to a "Service Agreement" dated June 1, 2001, providing that Tech Traders, Ltd., would place investment funds with Tech Traders, Inc., for trading.  (Stip. Fact 8.)

12.     TTI and TTL generally shared common ownership, office space and employees.  Most investor funds were held in bank or future commission merchant ("FCM") accounts carried in the name of TTI.  As there was no meaningful distinction between them, they are hereafter referred to generally as "Tech Traders."  (Stip. Fact 9.)

13.     Magnum Investments, Ltd. ("Magnum") was incorporated as a South Carolina corporation in 1991 but is not in good standing.  Magnum was a party to a "Service Agreement" dated June 1, 2001, purportedly providing that Magnum would place investment funds with Tech Traders, Inc. for trading.  (Stip. Fact 10.)

14.     Magnum Capital Investments, Ltd. ("MCI") was a foreign corporation organized under the laws of the Bahamas.  It is a sister company to Magnum Investments, Ltd., and

5

was party to a "Service Agreement" dated June 1, 1999, purportedly providing that MCI would send investment funds for placement with Magnum for trading.  (Stip. Fact 10.)

15. <u>Coyt Murray</u> ("Murray") was the president and chief executive officer of Tech Traders and was Tech Traders' primary contact person in dealing with potential participants.  Murray also controlled Magnum and MCI.  Murray and Tech Traders operated out of an office in Gastonia, North Carolina.  Murray represented to Firth and Shimer that Tech Traders used a "portfolio" system for successful trading of selected exchange-traded financial futures contracts, including the NASDAQ 100 and S&P 500.  He told Firth and Shimer that the success of the portfolio system derived from the fact that it utilized many different, allegedly non-correlated, separate systems traded concurrently on different time frames using proprietary algorithms, which not only helped filter out market noise for the purpose of more correctly determining the real direction of market trends, but also would balance and smooth the performance of the system.  (Stip. Fact 12.)

16. The Court previously found that:

a. Firth and Shimer acted as salespeople for Shasta.  They were associated persons ("APs") of Equity;

b. Neither Firth nor Shimer were registered as APs for Equity;

c. Equity is not registered with the CFTC  in any capacity.

17. From June 2001 through April 1, 2004, Defendants Firth and Shimer, acting individually and through Equity, solicited $15,113,498.11 in outside investor funds through Shasta and $295,143.81 in outside investor funds through New Century for trading by Tech Traders in commodity futures contracts.  Equity, acting through Firth and Shimer, and Firth and Shimer individually, touted the "astonishing" performance of the Shasta commodity pool, claiming that the pool had earned trading profits of approximately 100% per annum since inception.  (Stip. Fact 13.)

18. Defendants Tech Traders and Murray solicited and accepted net deposits of $13,883,381.20 from Shimer's escrow account and $296,143.81 directly from New Century to trade commodity futures contracts.  In total, Tech Traders received a total of $43,132,522.01 from Shasta

and other investors. At the time Tech Traders' assets were frozen by the court, Tech Traders, Inc. had returned a total of $11,984,471 of principal to investors, paid $617,942.19 in fictitious profits to investors, and from 2001 to April 1, 2004, lost $7,605,407 trading commodity futures contracts and other financial instruments in the accounts that held Shasta, and other third-party funds. Tech Traders also transferred over $2.4 million to Equity and to bank accounts controlled by Shimer or Firth. In order to make its investors whole, the receivership estate of Tech Traders, Inc., would need more than $15 million. (See Stip. Fact 14.)

19.    Murray often stated to Shimer and Firth that other individuals and/or entities had loaned money to his companies or had placed funds with his various companies for trading solely in the name of Murray's various companies. (Stip. Fact 15.) Firth and Shimer knew that Tech Traders and Murray pooled these funds with Shasta's funds. (Trial Tr., Firth, 8/27/07, 77-8 to 10; Shimer, 8/28/07, 101-12 to 13.) The Investment Agreement between Shasta and Tech Traders also provided that Shasta's funds would be intermingled with the funds of Tech Traders' other investors and that all investors' funds would be treated equally in the superfund. (Stip. Fact 27.) Shimer drafted and Firth signed this Investment Agreement. (Pl.'s Ex. 91; Trial Tr., Shimer, 8/28/07, 101-5 to 7.)

20.    Firth was the sole signatory on Equity's bank account and made decisions on disbursements out of that account. Firth also issued the monthly account statements to Shasta and New Century investors. (Stip. Fact 16.) He reviewed, approved, and distributed Shasta's Private Placement Memorandum. (Answer ¶¶ 29, 30, 48.) Therefore, Firth is a controlling person of Equity.

21.    Firth was registered in the securities industry as a registered representative of several broker-dealers between 1981 and 1990. (Answer ¶ 30.) The Shasta PPM states that Firth holds an NASD Series 7 license, creating the impression that the license was current, though it was not. (Trial Tr., Firth, 9/4/07, 10-17 to 11-1.) Firth had no experience with commodity pool accounting, no training in pool statement preparation and no experience with back office operations of a commodity pool. CFTC, 2006 WL 3751911, *6 (granting partial summary judgment to Plaintiff

7

CFTC).  The Shasta PPM does not disclose this lack of experience.  (Answer ¶ 49; Pl.'s Exs. 1093, 1070, 461.)

22.     Firth and his wife filed for bankruptcy, which was not disclosed in the Shasta PPM.  (Pl.'s Ex. 4; Trial Tr., Firth, 8/27/07, 116-1 to 117-4.)  Investors testified this information would have been important to their decision to invest in Shasta.  (Trial Tr., Dent, 8/29/07, 87-19 to 88-1; Tate, 8/30/07,44-2 to 15; Evans, 8/29/07, 72-13 to 25; Northridge, 8/31/07, 56-17 to 57-4.)

23.     Shimer did not inquire as to whether Firth had been in bankruptcy.  (Trial Tr., Shimer, 8/28/07, 97-7 to 9.)

24.     Shimer was legal counsel for Shasta and Equity.  He is an attorney admitted to the bar in Massachusetts in 1973.  (Stip. Fact 18.)

25.     From June to December 1986, Shimer was registered as an AP of Churchill Commodities, a former CPO that had been registered with the Commission.  From December 1988 to April 1989, he was registered as an AP of Capital Management Partners, a former introducing broker.  (Trial Tr., Shimer, 8/27/07, 175-3 to 5; Answer ¶ 21.)  He took and passed the Series 3 examination required for APs in the futures industry in 1986.  (Trial Tr., Shimer, 8/27/07, 174-15 to 175-4.)

26.     Shimer's only experience trading commodity futures contracts before forming Shasta was an account his wife had opened for six to eight months in the late 90's.  He does not have an accounting degree.  Before Shasta, he had never managed a commodity pool, never prepared commodity pool statements, and had no experience with commodity pool accounting procedures. In 2001, when he formed Shasta, he did not remember much about commodity trading.  (Trial Tr., Shimer, 8/27/07, 180-15 to 181.23.)

## PRIOR BUSINESS FAILURES OF SHIMER AND FIRTH

27.     Shimer formed a Nevada corporation called Kaivalya Holding Group in 1999. (Trial Tr., Shimer, 8/27/07, 181-24 to 182-1.) He was a director and shareholder. (Id. 82-1 to 10.) He and others collected investor money for three different investments. (Id. 182-10 to 20.)

28.     All Kaivalya investments failed. The first involved $669,000 of investor money (of which $345,000 was collected by Shimer). (Trial Tr., Shimer, 8/27/07, 182-21 to 183-16.) Investors got some payments for about a year, but did not recover all their principal. They only recovered 50-54%. (Trial Tr., Shimer, 8/27/07, 184-13 to 22.) The FBI investigated. (Id. 184-24 to 185-3.[3])

29.     Shimer admits the second Kaivalya investment was a "total disaster" also. (Trial Tr., Shimer, 8/27/07, 185-14 to 186-3.) Investors lost $325,000. (Id. 186-7 to 11.) This also was "an international scam." (Id. 186-6.)

30.     The third Kaivalya investment was made through intermediaries Jerry La Tulippe ("La Tulippe") and Tom Leonard ("Leonard"). Shimer became involved in this new investment to pay back the Kaivalya investors who invested in the earlier failed deals. (Perkins Dep. 13.4 to 14.3.) La Tulippe told Shimer that he had an exclusive relationship with a trader who was obtaining phenomenal trading results. (Trial Tr., Shimer, 8/27/07, 186-13 to 187-13.) That Trader was Coyt Murray. Shimer went to the Bahamas and met Coyt Murray. Murray told Shimer that he had licensed his trading system to Hubert Pinder, who had a trading platform in the Bahamas. (Id. 187-14 to 189-24.) Leonard or La Tulippe told Shimer that Murray's system was averaging 10% returns per day. (Id. 190-9 to 20.) After this meeting in the Bahamas, Shimer collected over $1,300,000 from investors to invest in Murray's trading system and wired the money to an account in the name of Good Works, which he was told was a company controlled by La Tulippe. (Id. 190-21 to 191-2.)

---

[3]The mechanics are detailed more fully later in this Opinion, but Shimer repaid some of these investors from all three failures from his (and Firth's) Shadetree account with Tech Traders. (Stip. Fact 19; Trial Tr., Shimer 8/27/07 185-4 to 14.)

31.     This third investment failed when according to Shimer, La Tulippe absconded with the money.  (Trial Tr., Shimer, 8/27/07, 198-14.)  This was to become known to Shimer as the "Tom and Jerry fiasco."  (Trial Tr., Shimer, 8/28/07, 40-11.)

32.     Shimer was pressured by some Kaivalya investors to pay them back.  There were threats of lawsuits and complaints to government authorities.  Shimer gave promissory notes to some investors from the third deal.  (Trial Tr., Shimer, 8/27/07, 192-6 to 197-20.)

33.     Shimer did not disclose the failed Kaivalya investment history to potential Shasta investors.  The Shasta PPM did not disclose these facts either.  (Answer ¶ 51; Pl.'s Exs. 1093, 1070, 461, 404 at .)  Investors testified this failed investment history would have been important to their decision to invest in Shasta.  (Trial Tr., Dent, 8/29/07, 88-6 to 9, 102-16 to 103-1; Evans, 8/29/07, 73-17 to 74-3; Northridge, 8/31/07, 57-23 to 58-4.)

34.     Beginning in the fall of 1999, Firth introduced several parties to Badishe Trust to secure financing.  Badische absconded with the parties' commitment fees.  At least two parties that Firth introduced to Badishe brought legal action against Firth and secured judgments or other relief against Firth.  (Answer ¶ 18; Pl.'s Exs. 1000, 1121, 1139; Trial Tr., Firth, 8/27/07, 117-4 tp 121.18; 122.20 to 124.9.)  The Shasta PPM does not disclose this failed investment deal or the fact that Firth was sued by people he solicited for financing deals.  (Pl.'s Exs. 1093, 1070, 461; Trial Tr., Firth, 8/27/07, 124-17 to 22.)  Investors testified it would have been important to know of Firth's failed investments and that he had been sued when making a decision to invest in Shasta.  (Trial Tr., Dent, 8/29/07, 88-10 to 16, 102-16 to 103-1; Evans, 8/29/07, 73-1 to 16; Tate, 8/30/07, 44-16 to 45-17; Northridge, 8/31/07, 57-5 to 22.)

## SHIMER AND FIRTH MEET AND BEGIN OPERATIONS;
## SHASTA FORMED

35.     Firth and Shimer met in the fall of 1999, through La Tulippe.  Shimer was introduced as La Tulippe's lawyer.  Firth learned before organizing Shasta that La Tulippe had taken investor money from Shimer for an investment with Murray and never paid it back.  (Trial Tr., Firth,

8/27/07, 69-10 to 71-15.)  This was the only business experience Firth had with Shimer prior to forming Shasta.  Id.  Firth failed to do any investigation of Shimer's background or experience before managing Equity.  (Id. 71-15 to 76-5.)

   36. In the fall of 2000, Shimer tracked down Murray to find out what had happened to the $1.3 million of investor money he had collected for Murray's trading system. Murray told Shimer that he had never received the money from La Tulippe that was supposed to be invested in his trading system.  (Trial Tr., Shimer, 8/27/07, 198-8 to 24.)  Shimer showed Murray some documentation that implicated Murray in Leonard's and La Tulippe's fraud and told Murray that he was considering reporting Leonard and La Tulippe to Florida criminal authorities.  Because of this threat, and even though he claimed never to have received the Kaivalya funds, Murray agreed to help Shimer repay the Kaivalya investors if Shimer placed funds for trading with him.  (Id. 198-25 to 201-16; Shimer, 9/05/07, 35-13 to 39-9.)

   37. Murray told Shimer he was just beginning to trade and that he had been back-testing his trading system for a year, although he had told Shimer in 1999 that he licensed it to Pinder the year before.  (Trial Tr., Shimer, 8/28/07, 17-8 to 12.)  Although Shimer had been told by La Tulippe and Leonard that Murray was successfully trading the system in 1999 through Pinder, Shimer did not ask Murray a lot of questions about his relationship with Pinder.  Murray told Shimer that he had returned money to Pinder after being advised by his attorneys to do so because Pinder was misusing investor funds.  Murray also told Shimer that he returned money given to him for trading to Pinder after suffering a trading loss.  (Id. 17-18 to 20-1.)

   38. Shimer and Murray agreed to solve Shimer's Kaivalya's problems (the three failed investments and those investors' demands to be repaid) by Murray sharing Tech "profits" with Shimer.  To do this, Murray would send a share of the "profits" to a Nevis Trust initiated by Shimer, called Shadetree.  (Trial Tr., Shimer, 8/27/07, 198-25 to 202-13.)

39.    Shadetree had no bank account. (Trial Tr., Shimer, 8/27/07, 203-15.) Murray made payments pursuant to this Shadetree agreement to bank accounts that Shimer controlled. (Id. 204-12 to 20.)  Money allocated to Shadetree went to Shimer and Firth. (Id. 204-23 to 206-8.)

40.    Sometime before June 30, 2001, Shimer drafted Shasta's Private Placement Memorandum ("PPM"), Operating Agreement, Subscription Agreement, the Agreement for Independent Verification of Shasta Capital Profits and Losses and Investor Questionnaire.  He was also responsible for all of Shasta's filings with the Securities and Exchange Commission and for all required notice filings in every state.  Shimer also tried to review every document Firth sent out for Equity.  In addition to preparing legal documents for Equity, Shimer also approved all subscription documents submitted to Shasta, accepted participant funds and deposited them into his attorney escrow account for further transmittal to Tech Traders and other entities and was Equity's primary contact person for dealing with Murray.  He spoke to Murray on almost a daily basis over the course of their relationship. (Stip. Fact 21.)

41.    After an initial 1% or 2% preferential rate of return to Shasta investors, Tech Traders was entitled to 15% of the "profits" from trading for trading and operational expenses and 50% of any remaining "profits," under the terms of the Shasta Private Placement Memorandum. (Stip. Fact 22.)

42.    Shimer drafted the agreement between Shadetree and Tech Traders, which was entered into on August 3, 2001.  It provided that Tech would allocate 5% of the 15% of its "profits" (for trading and operational expenses as per the Shasta PPM) to Shadetree and half of the 50% of any remaining "profits" allocated to Tech. (Stip. Fact 23; Trial Tr., Shimer, 8/27/07, 202-2 to 203-7.)  This agreement to further split the profits and allocate some to Shadetree was never disclosed in any version of the PPM or to any Shasta investor. Id. 203-10; 9/4/07, 159-3 to 11.

43.    Tech wired into a Kaivalya account under the control of Shimer $1,314,930 that was for Shadetree pursuant to the secret split of "profits." (Pl.'s Ex. 1152.)  Some of this money went to Kaivalya investors, but some went to pay a mortgage for Firth, and Shimer also gave $82,000

to David Perkins (a former Kaivalya associate) to pay a referral fee to Vernon Abernethy for referring Perkins to Shasta.  (Trial Tr., Shimer, 8/27/07, 219-10 to 220-10; 8/28/07, 8-8 to 10-19; McCormack, 8/30/07, 158-15 to 159-20; 167-14 to168-6.)

44.   Firth knew that Kaivalya investors were owed a lot of money and about the secret profit split to Shadetree that was not disclosed in the Shasta PPM.  (Stip. Fact 24.)

45.   Shasta investors testified they would have wanted to know about the secret Shadetree agreement  before investing in Shasta.  (Stevenson Dep. 70-6 to 72-12; Trial Tr., Dent, 8/29/07, 83-11 to 84-20; Evans, 8/29/07, 70-11 to 24; Tate, 8/30/07, 46-10 to 47-17.)

46.   Shasta had no separate bank account, but operated solely through Shimer's attorney escrow account.  Shimer opened that account, was the sole signatory on it, and controlled all funds deposited to it by Shasta investors and wired out to Tech Traders.  (Stip. Fact 29.)

47.   The Shasta PPM entitled Equity to a management fee of 5% of profits generated by the Tech Traders' trading system.  In addition to taking out payments pursuant to this 5% management fee, Shimer and Firth took out other payments pursuant to the undisclosed Shadetree agreement with Tech Traders.  Shimer and Firth also took out $335,000 more from Equity than the 5% management fee allowed.  (Trial Tr., McCormack, 8/31/07, 14-8 to 12; Pl.'s Ex. 1155.)

48.   Each investor or potential investor in Shasta received at least one of three different versions of the Shasta PPM: a) Plaintiff's Exhibit 1093, sent to all investors or prospective investors between June 30, 2001 and February 18, 2003; b) Plaintiff's Exhibit 1070, sent to all investors or prospective investors between February 18, 2003 and September 2, 2003; and c) Plaintiff's Exhibit 461, sent to all investors or prospective investors from September 2, 2003, until April 1, 2004. (Stip. Facts 67-69.)  Investors relied on the PPM and believed it contained all relevant information pertaining to Shasta and Equity.  (Pl.'s Exs. 461, 1070, 1093; Trial Tr., Tate, 8/30/07, 38-5 to 17; Northridge, 8/31/07, 48-3 to 19; Evans; 8/29/07, 68-23 to 70-1.)

49.   All members or prospective members of Shasta also received the URL address of Shasta's website.  (Stip. Fact 75.)

13

50.     Shasta also provided information about other websites that touted hedge funds to investors such as hedge10.net, barclaygrp.com, and hedgefundresearch.com.

51.     Shasta's website reflected the trading gains reported by Tech Traders from June 2001 through February 2004.[4]  As of March, 2004, the Shasta website stated returns of over 130%, for the period from March 2003 to February 2004.  (Stip. Fact 24.)  These high returns reported on the website influenced investors' decisions to invest in Shasta.  (Trial Tr., Tate, 8/30/07, 32-23 to 33-13, 40-5 to 15; Northridge, 8/31/07, 44-22 to 45-10, 46-20 to 47-3.)

52.     HedgeCo's website touted Shasta as a top performing hedge fund and featured Shasta as the hedge fund of the week during the week of March 14, 2004.  According to the hedgeco.net site, Shasta was up over 8% net of all fees for January and February 2004 and had also achieved net returns of 107.54% in 2002 and 92.02% in 2003.  Equity, through Firth and Shimer, supplied all of this performance information to Hedgeco and other third parties knowing that Hedgeco and other third parties would publish it.  (Stip. Fact 25.)

53.     Shimer received from Murray written technical information and a description of Tech's trading system.  Shimer incorporated the information received from Murray and made minor editorial changes in the information of Shasta's website that described Tech's trading system.  All information that did not specifically refer to Tech's trading system, how it worked, the philosophy behind it, and how it was developed was written by Shimer and published with the technical help of James George.  (Stip. Fact 26.)

54.     In 2001, Murray had presented Shimer and Firth with a three ring binder that described his trading system.  (Pl.'s Ex. 1001.)  He told Shimer and Firth that the information contained in the three ring binder was proprietary and represented a unique application of math algorithms to a trading system he and his son had developed.  (Trial Tr., Shimer, 8/29/07, 25-22 to 26-7.)  This material in the three ring binder was replicated on the Shasta website, which described the traders' trading system as a unique one that the trader had developed himself.  Shimer also told

---

[4]As will be demonstrated, these numbers were nothing but a sham.

14

investors that the trader developed the system himself.  (Stip. Fact 26; Trial Tr., List, 8/30/07, 62-19 to 23; Richardson, 8/31/07, 33-23 to 34-1.)

55.    Coyt A. "Lex" Murray, who was Coyt Murray's son and worked at Tech, sent Shimer an e-mail on January 10, 2001, stating that the trading system had hypothetically made 52.7% in 19 days which translates to a 26,291, annual percentage rate.  Information in the three ring binder also described hypothetical trading resulting in an APR of 714%.  Shimer knew this was unrealistic and the system would not accomplish these results in actual real time trading.  (Trial Tr., Shimer, 8/28/07, 30-8 to 31-12.)

56.    With limited exceptions, Equity, acting through Firth and Shimer, and Firth and Shimer individually did not identify to actual or prospective Shasta investors the identity of Tech Traders.  (Stip. Fact 28.)

57.    The court previously ruled that Equity, Firth and Shimer, used the mail and interstate telephone lines to communicate with investors.

58.    Murray used the term "credits," rather than profits, on the account statements he issued to investors and told Shimer to use that term on the Shasta statements from Tech Traders that Shimer created.  (Trial Tr., Shimer, 8/28/07, 136-14 to 137-4.)  He described the term to Shimer as a posting to the account of conditional profit.  (Stip. Fact 30; Trial Tr., Shimer, 8/28/07, 137-2 to 7.)  Murray also used the term "credits" in describing what his trading system did.  (Id. 136-20.)

## DAVID KAPLAN

59.    David Kaplan developed the condominium which Shimer and his wife owned.  Shimer contacted Murray about Kaplan who had expressed an interest in investing.  Shimer falsely told Kaplan that he (Shimer) had a client who was trading the futures market with real success, that the trading company was his legal client, and that he had been following the trading results for a year.  (Trial Tr., Shimer, 8/28/07, 40-14 to 42-9.)  He asked Murray not to tell Kaplan about the

secret Shadetree profit splitting arrangement or the "Tom and Jerry fiasco." (Id. 39-18 to 40-13; 42-14 to 43-9.)

60.     Kaplan asked a number of questions of Murray which made Murray uncomfortable. Murray told Shimer he wanted to keep his finances private. (Stip. Fact 31; Pl.'s Ex. 1118.)

61.     Kaplan would have permitted Murray to trade his (Kaplan's) money pursuant to a power of attorney in an account in Kaplan's name. Such an arrangement would let an investor such as Kaplan control the funds in the account while the trader controlled the trades. Such a system prevents misappropriation. (Trial Tr., Shimer, 8/28/07, 49-8 to 52-22.) Other investors expressed a similar interest. Murray never told Shimer he would agree to that. (Id.) Kaplan never invested with Murray. (Id. 49-7.)

62.     After the Kaplan meeting, Shimer told Murray potential investors wanted assurances before they would invest. (Pl.'s Ex. 1113.) At this point, Shimer first mentioned the idea of independent verification of Tech Trader's returns. (Id.; Trial Tr., Shimer, 8/28/07, 58-11 to 18; 9/4/07, 82-21 to 83-7.)

63.     The Shasta PPM claimed that Equity, as manager of Shasta, conducted due diligence on Tech Traders' results and trading system. Firth, Equity's president, never saw any documentation of Tech Traders' results. (Trial Tr., Firth, 9/4/07, 22-1 to 12.)

64.     The first Shasta PPM claimed Tech Traders' system achieved profits of over 40% net to the investor during real time trading. (Pl.'s Ex. 1093.) This figure was apparently based on results Shimer claimed on an Edgar investment. But it was misleading because Murray would not verify Edgar results, Murray never represented a return of 40%, Murray never gave Shimer any consistent rate of return number, and Shimer himself calculated that number from sporadic letters from Murray which only contained dollar amounts. (Pl.'s Ex. 1130; Trial Tr., Shimer, 8/28/07, 98-9 to 100-16.)

65.     Shimer never received consistent and reliable information for Tech Traders or Edgar's trading results and the information Murray provided about his trading system was purely hypothetical.  (Trial Tr., Shimer, 9/5/07, 19-5 to 19.)   Neither Shimer nor Firth <u>ever</u> saw any brokerage statement from any of Tech Traders' alleged trading accounts.  (Trial Tr., Shimer, 9/5/07, 19-22; Firth, 9/4/07, 22-1 to 12.)

66.     The Shasta PPM provided that there would be "independent" verification of the trading results through two CPA's.  (Pl.'s Ex. 1093.)   Firth did not even understand this "independent" verification process.

## THE "INDEPENDENT" ACCOUNTANTS AND THE VERIFICATION PROCESS

67.     Obtaining an independent certified public accountant (CPA) to verify Tech Traders' results was Shimer's idea.  (Stip. Fact 36.)  Firth never talked to Murray about hiring a CPA.  (Trial Tr., Firth, 8/27/07, 78-1 to 12.)

68.     Shimer wanted an old friend from Portland, OR, Elaine Teague, to perform the independent verification.  (Trial Tr., Shimer, 8/28/07, 58-19 to 59-25.)   Neither Teague, nor Shimer, nor Firth had any experience in calculating rates of return for commodity pools.  (Teague Dep., 306-4 to 307-9; Trial Tr., Shimer, 8/27/07, 181-14 to 16.)

69.     Getting an accountant on board to verify results was a long, arduous process closely managed by Shimer.  Shimer thought of Teague because she was honest, he feared large firms wouldn't take on the assignment in a post-Enron environment, and she'd take phone calls from investors.  (Stip. Fact 37.)

70.     Shimer suggested to Murray that Teague verify Murray's trading results for 2000, and each month of 2001, by reviewing trading statements to be sent directly to her from the futures commission merchant (FMC), which would prevent Murray from altering them or providing select information.  (Trial Tr., Shimer, 8/28/07, 60-1 to 63-1; Pl.'s Ex. 1118.)   Teague wanted the original brokerage statements sent to her.  (Trial Tr., Firth, 8/27/07, 78-17 to 22.)  She also wanted

Tech's bank statements to verify what money came in and out of Shasta. (Teague Dep. 301-7 to 17.) Murray refused to send original statement to anyone; he wanted statements reviewed in his office. Therefore, the focus shifted to a local CPA. (Trial Tr., Firth, 8/27/07, 79-17 to 22; Shimer, 8/28/07, 70-9 to 71-14; Stip. Fact 39.)

71.     Murray originally sought Robert Collis, a local CPA whose firm had done work for Murray. (Trial Tr., Shimer, 8/28/07, 71-2 to 9; Collis Dep. 9-5 to 12-41.) Collis declined, despite Shimer's attempts to convice him to do it. Collis was concerned that Tech might need to be registered under the securities laws and that his firm didn't have the expertise to verify performance returns for an investment. (Pl.'s Ex. 588; Stip. Fact 40; Collis Dep. 15-9 to16-16; 24-2 to 25-5; 29-20 to 32-11; 33-1 to 24; 35-4 to 37-23; 39-23 to 40-16.)

72.     After Collis declined the proposed engagement, Murray decided to hire J. Vernon Abernethy ("Abernethy"), a local CPA, to review and verify Tech Trader's trading results and supply a monthly trading performance rate of return figure to third parties. (Stip. Fact 40.)

73.     Abernethy was not qualified to verify the rate of return for Tech Traders' trading system. Prior to his Tech Traders' engagement, he had never calculated the rate of return for a commodity pool. He was not and is not aware that there exist CFTC regulations on how to calculate a rate of return for a commodity pool. He had never done any work for any kind of trading company before. He did not know when he undertook to do the work that Murray was involved in commodity futures trading. He had never seen a futures commission merchant's statement before and did not know how to read one. He never learned the difference between a month end brokerage statement, which shows all the additions and withdrawals from the commodity trading account for the month, and a daily statement, which does not. (Trial Tr., Abernethy, 8/30/07, 76-21 to 23; 77-20 to 78-8; 81-16 to 20; 93-15 to 22; 141-1 to 142-13; McCormack, 8/30/07, 145-23 to 147-8.)

74.     Neither Firth nor Shimer investigated Abernethy's background or his ability to calculate rates of return. (Stip. Fact 46; Trial Tr., Firth, 8/28/07, 84-4 to 21.) Shimer knew

18

Abernethy had no experience with commodity trading firms.  (Trial Tr., Shimer, 8/27/07, 78-25 to 79-2.)

75.     By early 2002, Firth and Shimer wanted to replace Abernethy.  He was difficult to deal with.  The reports were late, and they felt he wasn't a true third party.  (Trial Tr., Firth, 8/27/07, 87-21 to 89-19.)  Shimer told Firth Murray wanted Abernethy to stay.  (Id. 89-15.)  On one occasion, according to a Shasta investor, Firth was concerned that the rate of return numbers being reported by Abernethy incorrectly contained investor additions to the pool of funds.  (Trial Tr., Northridge, 8/31/07, 54-24 to 55-22.)

76.     Equity employed Teague for the limited purpose of receiving, without further verification on her part, a rate of return number verified in writing by a CPA local to Tech's trading operation designated by Tech Traders and Murray and approved by Shasta.  She was also retained by Equity to be available to members or prospective members of Shasta to receive their phone calls and to confirm that she knew the identity of the local CPA who provided her with a verified rate of return number for trading by Tech each month.  She was also retained to confirm to Equity outside "hedge fund" performance numbers by contacting the management of those funds or, in the alternative, reviewing the websites of those funds.  She was also employed to issue end of year K-1s to all of Shasta's members and prepare Shasta's partnership return.  (Stip. Fact 37.)

77.     Firth had few dealings with Teague.  Most of Teague's interactions on the engagement were through Shimer.  (Stip. Fact 38.)

78.     Although the PPM stated that Teague would perform due diligence on the qualifications and reliability of Abernethy, neither Shimer nor Firth did anything to assure that Teague investigated Abernethy's background.  (Stip. Fact 46; Trial Tr., Shimer, 8/28/07, 80-1 to 82-9.)

79.     Shimer drafted for each Shasta investor an Agreement for Independent Verification of Shasta Capital Associates Profits and Losses.  (Stip. Fact 71.)  Teague never saw it.  (Trial Tr., Shimer, 8/28/07, 153-4 to 154-3.)

19

80.     Shimer was Teague's main point of contact regarding Shasta (Stip. Fact 52) and dealing with Murray and Abernethy to develop the procedures to verify Tech's trading results. (Teague Dep. 320-5 to 21; 322-15 to 17; 439-4 to 7.)

81.     At the beginning of her engagement, Teague had expected to receive a report of trading performance created by Coyt Murray along with Abernethy's agreed upon procedures letter verifying the returns.  (Stip. Fact 53.)  However, Shimer called her and told her that she would not receive the report because Murray had told him it contained information about funds other than Shasta's to which Murray did not want her to have access.  (Teague Dep. 415-25 to 417-15.)

82.     Murray did not produce timely or accurate reports.  (Trial Tr., Shimer, 8/28/07, 34-9 to 11; 134-13 to 22.)  Sometime in early 2002, Shimer took over the drafting of Tech Traders' monthly reports (account statements) to Shasta, which were supposed to originate with Tech Traders.  (Trial Tr., Shimer, 8/28/07, 124-4 to 10, 126-22 to 128-23.)  Firth knew that Shimer was preparing Tech Traders' reports to Shasta.  (Trial Tr., Firth, 9/4/07, 24-23 to 25.)  The Shasta PPM stated that Equity, the Manager, was responsible for receiving on behalf of Shasta, a monthly statement from the Trading Company.  (Pl.'s Ex. 1070; Pl.'s Ex. 461 at 21; Pl.'s Ex. 1093 at 27.)

83.     Neither Shimer nor Firth ever told Teague that Shimer prepared the monthly reports.  (Trial Tr., Firth, 9/4/07, 25-8; Shimer, 9/6/07, 5-25 to 15-17.)  Shimer knew Teague wanted the information about beginning and ending balances to come directly from Tech Traders as she thought that would be evidence of third party verification.  (Id.)

### AGREED UPON PROCEDURES

84.     Firth played no role in the development of a procedure for verifying Tech Traders' rate of return.  He relied on Shimer to assure that Shasta's investors received accurate information about the performance of their Tech Traders investments.  (Stip. Fact 42.)

85.     It was decided that Abernethy would perform the verification of Tech Traders' trading results through a set of Agreed Upon Procedures ("AUP").  These procedures were described

in a letter that Abernethy sent each month to Murray ("AUP letter"). Each letter gave a monthly and sometimes quarterly return number. This AUP letter was then forwarded each month by Murray or Abernethy to Teague. Teague took Abernethy's performance number, inserted it into her own letter to Equity ("Verification Letter") and then forwarded her letter with the performance number obtained from Abernethy on to Firth. (Stip. Fact 41.)

86.     In November 2001, Shimer revised a draft Verification Letter from Puttman & Teague to Equity to include explicit language that stated that Abernethy was granted full access to the in-house trading records of Tech Traders and was given the opportunity to review original brokerage statements. (Pl.'s Ex. 39; Trial Tr., Shimer, 8/28/07, 142-6 to 143-l6.) Shimer sent this draft letter to Abernethy at Abernethy's request because Abernethy told Shimer he wanted to make sure Teague was not saying something he did not want her to say. (Trial Tr., Shimer, 8/28/07, 140-1 to 141-3.) Abernethy crossed out the language in the draft Verification Letter that stated he was granted full access to records and original brokerage statements. He replaced it with language stating that Shasta Capital Associates had received and accepted as reasonable and reliable for the purpose for which they were to be used the agreed-upon procedures established between Abernethy and Tech Traders. (Pl. Ex. 39; Trial Tr., Shimer, 8/30/07, 143-16 to 145-20; Abernethy, 8/20/07, 99-1 to 25.) Shimer did not tell Teague that Abernethy had made those changes to her letter. (Teague Dep., 515-3 to 517-17; Trial Tr., Shimer, 8/28/07, 147-4 to 16.) He also did not object to Abernethy's changes but accepted them all word-for-word. (Pl. Ex. 40; Trial Tr., Shimer, 8/28/07, 147-2; 147-17 to 21; 148-1 to 2.)

87.     Firth acknowledged that the CPA verification process was put in place to provide comfort to investors that the trading results were authentic. (Stip. Fact 47.)

88.     Teague performed no independent review of the rate of return numbers provided to her by Abernethy. Nonetheless, Shimer and Firth made her available to answer investor questions. She was allowed to confirm the performance number each month, but she was not allowed to give investors the name of either Tech Traders or Abernethy. (Stip. Fact 42.)

89.     Shasta investors testified they believed Teague was doing an independent review of Tech Traders' performance, which was important to their decision to invest in Shasta. (Trial Tr., Stevenson, 51-12 to 25; Dent, 8/29/07, 85-23 to 86-3, 86-14 to 87-3, 97-11 to 18; Evans, 8/26/07, 65-18 to 24; McManigal, 8/30/07, 9-14 to 10-7; List, 8/30/07, 63-4 to 23; Richardson, 8/31/07, 36-23 to 37-19; Northridge, 8/31/07, 51-25 to 52-13, 53-17 to 54-9.)

90.     Shimer deliberately made Teague available for investor calls because he knew the investors wanted assurances a CPA was verifying the information Shasta provided.  (Trial Tr., Shimer, 9/5/07, 52-13 to 53-14.)  The investors thought she was doing more than merely sticking a number in a letter, a number she had no role in calculating.  (Id.)

91.     Teague never met Abernethy and only talked with him on the phone a few times.  (Stip. Fact 48; Teague Dep., 488-19 to 489-6; Trial Tr., Abernethy, 8/30/07, 110-1 to 20.)

92.     Shimer invented the formula for determining profits in the Tech Traders' accounts.  He defined it in the Investment Agreement between Shasta and Tech Traders.  (Pl.'s Ex. 91; Trial Tr., Shimer, 8/28/07, 101-5 to 20; 104-2 to 105-11; 118-14 to 119-23; 9/05/07, 83-5 to 25.) Shimer thought it such a simple calculation that anyone with sixth grade math skills could do it. (Trial Tr., Shimer, 8/28/07, 114-18.)  Though Abernethy used the formula in "verifying" Tech Traders' monthly performance, he told Shimer it was not a simple process.  (Trial Tr., Abernethy, 8/30/07, 89-16, 90-15.)

93.     The Shimer formula does not provide enough information to properly analyze or calculate a rate of return.  (Pl.'s Exs. 91, 1061; Trial Tr., Koprowski, 8/29/07, 139-5 to 10.)  The Shimer formula didn't comply with any recognized rules or regulations and was grossly misleading and deceptive to the public.  (Trial Tr., Koprowski, 8/29/07, 141-13 to 25.)

94.     Teague told Shimer and Firth there were four different CFTC approved methods for calculating rates of return in connection with hedge funds she was following for Shasta. (Pl.'s Exs. 423, 426, 432, 433; Trial Tr., Shimer, 8/28/07, 113-13 to 117-9; Firth, 8/27/07, 80-17 to

83-22.)  Teague told Shimer she did not know how the performance calculation was done for Tech Traders.  (Pl.'s Ex. 426; Trial Tr., Shimer, 8/28/07, 108-110 to 14.)

95.     In order to properly calculate a rate of return for a commodity pool, a person must have a general knowledge of the futures industry, an understanding of the nature of the fees the commodity pool incurs, an understanding of the agreement between the commodity pool and its participants; all documentation detailing the transactions that occurred during the given time for which the rate of return is to be calculated, and the ability to read and understand a monthly FCM statement.  (Pl.'s Ex. 1061 at 5-7; Trial Tr., Koprowski, 8/29/07, 118-17 to 119-1.)  If the pool accepts additions and withdrawals other than at the end or the beginning of a reporting period, the pool should account for these additions and withdrawals by using one of the four alternative methods approved by the CFTC for computation of a rate of return.  (Pl.'s Ex. 1061 at 5-7; Koprowski, 8/29/07, 120-9 to 121-24.)

96.     In order to perform a rate of return calculation using any approved method, a person would have to have available the cash receipts and disbursements journal, the general ledger, the participants' subsidiary ledger, bank and trading account statements and other documents relevant to income and expenses.  (Pl.'s Ex. 1061 at 7; Trial Tr., Koprowski, 8/29/07, 119-17 to 120-8; 122-9 to 20.)

97.     Abernethy never had full access to Tech Traders' records and never received brokerage statements or bank statements directly from the FCM or bank.  He received brokerage statements from Murray and did not know if they had been altered before he received them.  Abernethy also did not have access to Tech Traders' cash receipts and disbursements journal or to any other documents relative to income or expenses.  He received only whatever documents Murray gave him and Murray did not give him all the records he requested.  (Trial Tr., Abernethy, 8/30/07, 90-13 to 91-4, 91-16 to 95-12, 96-4 to 97-13.)

98.     Firth, Shimer and Teague did not know what Abernethy reviewed to arrive at a rate of return.  (Pl.'s Ex. 426; Trial Tr., Shimer, 8/28/07, 108-10 to 14; Firth, 9/4/07, 22-17 to

23

19.)  But Shimer knew that Abernethy did not have full access to all the records necessary to calculate an accurate rate of return.  (Pl.'s Ex. 39; Trial Tr., Shimer, 8/28/07, 142-6 to 145-20.) Shimer also knew that Teague didn't know what Murray gave Abernethy to review.  (Trial Tr., Shimer, 8/28/07, 148-5 to 150-22; Pl.'s Ex. 470.)

99.     Abernethy issued AUP letters verifying Tech Traders' performance from June 2001 through February 2004.  (Stip. Fact 43.)  He reported a quarterly return for July, August and September, 2001.  (Pl.'s Ex. 1009; Trial Tr., Abernethy, 8/30/07, 101-3 to 6, 17 to 21.)  But Shimer wanted to report monthly returns to Shasta investors on the website so he took the mathematical average for these three months.  (Trial Tr., Shimer, 8/28/07, 88-3 to 89-13.)  In June of 2002, Shimer learned that there was actually a loss in September 2001.  (Id. 89-14 to 92-14.)  However, he never changed the Shasta website or the PPM to reflect that.  (Id. 92-15 to 22.)  The same is true for Firth.  (Trial Tr., Firth, 8/27/07, 125-9 to 128-17.)

100.     The AUP letters Abernethy produced showed gains for every month or quarter reported on from June 2001 through February 2004.  Abernethy reported double-digit gains for at least 23 of the 33 months during this period.  The worst performance reported was a purported gain of 4.11% for the month of June 2001, and the next worst performance reported was a purported gain of 9.02%, for the month of January 2004.  (Stip. Fact 45.)

101.     Abernethy was supposed to be "independent."  The Shasta PPM, though it didn't name him, claimed the CPA who verified the trading system's results was independent.

102.     Shimer knew Abernethy was in debt as a result of getting divorced and splitting up his accounting business.  (Trial Tr., Shimer, 8/28/07, 77-3 to 78-7.)  Firth and Shimer (at Murray's suggestion) asked Abernethy to solicit potential investors in Shasta.  (Pl.'s Ex. 18; Trial Tr., Firth, 8/27/07, 87-5 to 21; Shimer, 8/28/07, 157-8 to 19, 158-8 to 164-7.)

103.     Abernethy did refer and solicit potential investors to Shimer and Firth and

brought in one investor to the Shasta pool–Jerry Pattus. (Trial Tr., Firth, 8/27/07, 85-6 to 87-20; Shimer, 8/28/07, 157-11 to 24.)  Shimer expected more referrals and expected to pay Abernethy out of the Shadetree account.  (Trial Tr., Shimer, 8/28/07, 161-6 to 164-7.)

104.    Investors testified it would have been important to know Abernethy solicited investments for Shasta because this solicitation was evidence of a conflict of interest.  (Trial Tr., Stevenson, 53-24 to 55-2; Dent, 8/29/07, 87-4 to 18.)

## MINIMUM ACCOUNT VERIFICATION

105.    Shimer wanted Shasta investors to know that Tech Traders had enough money on deposit to cover Shasta's deposits to Tech.  The PPM stated that Teague would tell investors if Tech Traders had enough money in its brokerage account to cover Shasta's deposit. (Pl.'s Exs. 461, 1079, 1093.)

106.    Shimer put this in the PPM before Abernethy ever agreed to verify Shasta's balance.  Though he repeatedly asked Abernethy to do so, Abernethy refused.  Teague could thus not provide any assurances about Shasta deposits.  (Trial Tr., McManigal, 8/30/07, 30-4 to 11; Abernethy, 8/30/07, 103-2 to 106-2.)  Abernethy did eventually provide to Shimer a statement about what total funds were in the brokerage accounts, but not how much of it was Shasta's.  He got the information from Murray and knew it was meaningless.  (Trial Tr., Abernethy, 8/30/07, 106-6 to 108-5; Shimer, 9/5/07, 91-9 to 92-3.)

107.    The first such statement, in a letter dated September 1, 2002, stated that the total funds in the brokerage accounts as of July 31, 2002, exceeded $1.1 million.  At that time, Shimer and Firth believed that Shasta, New Century and Shadetree had a combined deposit balance of over $1.5 million.  Shimer and Firth knew also that Tech Traders had other investor funds.  (Pl.'s Exs. 44, 1156; Trial Tr., Shimer, 8/29/07, 13-3 to 14-25.)  On three occasions, Abernethy verified a minimum balance that was lower than the amount Shasta's own statements reflected it had on deposit with Tech Traders.  (Pl.'s Ex. 1156; Trial Tr., McCormack, 8/31/07, 18-3 to 12.)  Firth knew

Abernethy only set out to verify an amount dealing with Shasta deposits. (Trial Tr., Firth, 8/27/07, 128-19 to 130-18.)

108.    The agreement for Independent Verification of Shasta Capital Associates Profits and Losses promised a year end audit. (Pl.'s Ex. 1089.) Murray and Tech Traders repeatedly refused an audit, claiming it would reveal Murray's trading methods. Firth found it unlikely that an auditor would try to discover Murray's methods. Teague told Shimer an audit would not reveal any proprietary methods. But Shimer gave Murray some accommodation because the numbers being reported were so good.

109.    Investors testified that the refusal to submit to an audit would have been important to their decisions to invest in Shasta. (Trial Tr., Stevenson, 76-4 to 17; Dent, 8/29/07, 80-16 to 81-2.)

## REGISTRATION REQUIREMENTS

110.    Shimer's belief that Shasta did not have to register with the CFTC as a commodity pool operator (CPO) stems from a lawyer friend of Shimer's who put him in touch with someone who Shimer recalls was named "Chuck" who Shimer believed worked for Chase Manhattan Bank. When Chuck asked Shimer if Shasta had to register, Shimer researched the matter and wrote a memo with no legal analysis which concluded Shasta did not have to register as a CPO. (Trial Tr., Shimer, 8/29/07, 35-5 to 38-11; Pl.'s Ex. 411.)

111.    Shimer sent this memo to his friend, who sent it  to Chuck, who allegedly forwarded it to Chase's legal department. Shimer claims that his lawyer friend thereafter told him Shasta did not have to register with the CFTC. (Trial Tr., Shimer, 8/29/07, 38-22 to 40-12.)  He never contacted the CFTC or the National Futures Association ("NFA"), nor did he request any written confirmation from the Chase attorney, nor did he ever receive any legal opinion from anyone else confirming his conclusions.  (Id. 38-12 to 21.)

26

112.    Shimer was aware in 2001, from his review of Section 4.13 of the CFTC regulations, that even if an exemption was available under that section, the CPO had to file a notice of exemption with the NFA or the CFTC.  (Stip. Fact 59.)

113.    Shimer did nothing else to determine Shasta or Equity's registration requirements until the fall of 2003, when potential investors Mark Munson and Nicholas Stevenson told Shimer and Firth the CFTC told them (Munson and Stevenson) that Shasta was required to register.  (Stevenson Dep. 80-3 to 81-20; Trial Tr., Firth, 8/27/07, 96-2 to 97-18; Shimer, 8/29/07, 40-13 to 21.)

114.    As a result of this contact from Munson and Stevenson, Firth and Shimer hired the law firm of Arnold & Porter ("the Firm") in October of 2003 to review Shasta's registration requirements.  (Pl.'s Exs. 538, 657; Trial Tr., Firth, 8/27/07, 97-14 to 24; Shimer, 8/29/07, 40-18 to 41.3.)  Arnold & Porter lawyers who worked for Shimer and Firth were Geoffrey Aronow, a former Director of Enforcement for the CFTC (1995-99) and Susan Lee, formerly Chief of Staff of the CFTC (1996-99).  Most of Lee's contact was with Shimer.  (Stip. Fact 60.)

115.    Early on, Arnold & Porter told Shimer and Firth that Shasta was a commodity pool and that Tech Traders was commodity pool.  The Firm also told Shimer and Firth that Shasta or Equity's registration requirements would depend on Tech Traders' registration status.  (Pl.'s Ex. 1038; Lee Dep. 21-16 to 23-14; Trial Tr., Firth, 8/27/07, 99-1 to 13; Shimer, 8/29/07, 42-7 to 44-23.)

116.    The Firm also told Shimer at the beginning that Tech Traders could not trade Shasta's funds in its own name or commingle its funds with Shasta's.  (Lee Dep. 30-17 to 31-2, 31-7 to 20.)  The Firm also disagreed with Shimer's legal analysis, which he updated in 2003 and which had concluded Shasta was not a commodity pool.  The Firm felt he was not taking into account CFTC regulations that state a fund-of-funds, like Shasta, is itself a commodity pool.  The Firm also thought his analysis that Shasta or Equity did not receive compensation because it was only paid if there were profits was incorrect.  (Pl.'s Ex. 411; Lee Dep. 57-13 to 59-19.)

27

117.    Because Shasta's registration requirements hinged on that of Tech Traders, the Firm advised Shimer and Firth to go to the CFTC with Tech to cure the regulatory deficiencies. (Stip. Fact 61).  The Firm advised Shimer that Shasta should meet with the CFTC and Tech's counsel as soon as possible.  (Stip. Fact 63.)

118.    By December of 2003, the Firm expressed a sense of urgency to Shimer to contact the CFTC.  (Pl.'s Exs. 543, 553, 544, 548; Trial Tr., Shimer, 8/29/07, 45-1 to 46-4; 50-22 to 51-4;  51-19 to 52-7.)  Firth received the e-mails Lee sent to Shimer.  (Pl.'s Exs. 543, 553; Trial Tr., Firth, 8/27/07, 100-17 to 101-15.)  Lee expressly stated the Firm was concerned that Shasta was exposed to charges that it  was operating an unregistered and illegal commodity pool.  (Pl.'s Ex. 543; Trial Tr., Shimer, 8/29/07, 45-1 to 46-4.)  The Firm told Shimer (who told Murray) that the CFTC would look at the investment as a Ponzi scheme because the numbers were so good.  (Trial Tr., Shimer, 8/29/07, 16-24 to 17-7.)

119.    Shimer told Murray in a letter of December 12, 2003, about Lee's concerns. (Pl.'s Ex. 548.) The Firm sent yet another warning to Shimer and Firth on December 18, 2003. (Pl.'s Ex. 553.)

120.    Shimer often told Lee that Murray was a secretive man who had to be treated with kid gloves.  (Stip. Fact 66.)  He also told Lee that Shasta wanted to continue to trade through Tech Traders because it was a very good opportunity for them.  (Pl.'s Ex. 538; Lee Dep. 105-19 to 108-1.)

121.    Shimer continued to try to talk Murray into registering Tech Traders.  Neither Shimer nor Firth ever registered Equity.  (Pl.'s Ex. 553; Trial Tr.,  Shimer, 8/29/07, 54-20 to 56-20; 57-2 to 7; 58-19 to 59-20; McManigal, 8/30/07, 14-2 to 18.)

122.    The Firm had incomplete information about Shasta and Shimer's and Firth's relationship with Murray and thus did not suspect Shasta was involved in a fraud.  (Lee Dep. 28-20 to 30-16; 31-21 to 32-17; 34-4 to 40-4; 45-8 to 48-21; 76-6 to 80-16; Trial Tr., Shimer, 8/29/07, 59-21 to 60-24.)

123.     Firth and Shimer continued to solicit investments in Shasta.  From November 2003 to April 2004, Shasta took in over $8.5 million from investors.  (Pl.'s Ex. 1157; Trial Tr., Firth, 8/27/07, 99-2 to 100-4; Shimer, 8/29/07, 46-23 to 47-15; 55-20 to 56-1.)  Shimer stated no one wanted to take action that would result in the end of trading with Tech Traders "so long as the number were still there."  (Trial Tr., Shimer, 8/29/07, 55-23 to 56-20.)

124.     By the fall of 2003, Shimer and Firth knew the CFTC was investigating Shasta.  They did not disclose this to prospective investors who testified this would have been important to know before they invested.  (Trial Tr., Shimer, 8/29/07, 12-15 to 20; 32-24 to 33-5; 45-13 to 24; Firth, 8/27/07, 99-2 to 100-4;  9/4/07, 19-20 to 25; Dent, 8/29/07, 90-17 to 24; McManigal, 8/30/07, 18-17 to 24; Richardson, 8/31/07, 38 -19 to 25; 39-1 to 9; Evans, 8/29/07, 74-3 to 13.)

## WARNING SIGNS

125.     Murray's inconsistent stories about his past trading should have been a red flag.

126.     Murray's unrealistic hypothetical trading results should have been a red flag.

127.     Murray's refusal to trade in investor names was a red flag that he wanted to hide his actual trading results.

128.     That neither Shimer nor Firth ever reviewed a brokerage statement from any of Tech Traders' future commission merchants accounts should have alerted them to potential problems with the investments.

129.     Shimer's phone conversations with Collis put him on notice that there might be regulatory issues and that the work he was asking an accountant to perform was specialized and required expertise.

130.     Shimer knew Abernethy was not qualified to do the accounting work he sought.

131.     Shimer and Firth knew Abernethy was not "independent," and their representation in the PPM that they would provide independent verification was false and fraudulent.

132.     Shimer knew Teague was not independent.

133.     Shimer knew all that Teague did was repeat the number Abernethy provided.

134.     Shimer and Firth fraudulently failed to disclose in the PPMs that Shimer and not Tech Traders actually prepared the monthly reports.

135.     Shimer and Firth knew, or recklessly failed to know, that Abernethy and Teague's numbers were not accurate at any point.

136.     Shimer's "formula" for determining profits was ridiculous and inaccurate, and he knew because of the information Teague gave him that it was unreliable.  Firth recklessly agreed to it.

137.     Shimer and Firth should have made themselves aware of what Abernethy was relying on.  The failure to do so was at least reckless.

138.     The claim in the PPM that Teague would verify that Tech Traders had enough on deposit to satisfy Shasta's deposits to Tech was a knowing misrepresentation.

139.     Shimer's gratitude towards Murray for Murray's agreement to help Shimer with the Kaivalya disasters caused Shimer to willingly overlook ample evidence of Murray's fraud.

140. Defendant Shimer made illegal gains of $1,452,117 during the relevant time.  (Trial Tr., McCormack, 8/30/07, 166-7 to 167-21; Pl.'s Ex. 1150.)

141.     Defendant Firth made illegal gains of $450,313 during the relevant time frame.  (Trial Tr., McCormack, 8/30/07, 169-11 to 170-9; Pl.'s Ex. 1148.)

142.     Defendant Equity made illegal gains of $612,500 during the relevant time period.  (Trial Tr., McCormack, 8/30/07, 163-7 to 15; Pl.'s Ex. 1149.)

143.     Shasta pool participants are owed restitution in the amount of $4,543,903.31.

30

## CONCLUSIONS OF LAW

A.      Shimer and Firth had fiduciary obligations.

B.      Equity is a Commodity Pool Operator ("CPO") and violated Section 4m(1) of the Commodities Exchange Act when it failed to register as such.

C.      Defendants Firth and Shimer acted as Associated Persons ("APs") for Equity and violated Section 4k(2) of the Commodities Exchange Act when they failed to register as such.

D.      Tech Traders was a Commodity Trading Advisor ("CTA") and violated Commission Regulation § 4.30.  Shimer aided and abetted Tech Traders' violation of Commission Regulation § 4.30 because he knew that Tech Traders violated § 4.30, and he intentionally assisted in Tech Traders' violation by "drafting documents that governed these violations. . . ."  CFTC, 2007 WL 1038754, *4.  Specifically, Shimer aided and abetted Tech Traders' Regulation 4.30 violation because: 1) Tech Traders violated § 4.30 by trading Shasta's funds in its own name; 2) Shimer knew that Tech Traders was trading Shasta funds in its own name; and 3) Shimer intentionally assisted Tech Traders in committing this violation by drafting the PPM and the Investment Agreement, which allowed Tech Traders to trade Shasta funds in its own name.

E.      While acting as an AP for Shasta, a CPO, Firth violated Section 4o(1)(B) of the Act by acting intentionally using interstate commerce to engage in a business that operated as a fraud when he sent the PPM to investors, and the PPM had the effect of defrauding or deceiving potential investors.  While acting as an AP for Shasta, a CPO, Shimer violated Section 4o(1)(B) of the Act by acting intentionally using interstate commerce to engage in a business that operated as a fraud when he ignored numerous warning signs relating to Tech Traders and Murray, and his inaction had the effect of perpetrating a fraud on Shasta's investors.  Those warning signs included Shimer himself producing Tech Traders' reports to Shasta when the PPM stated that Tech Traders would produce them, the lack of monthly verification of the amount in Tech Traders' trading accounts, the fact that Tech Traders would only verify that the amount in their trading accounts was

31

enough to cover Shasta's investors (Teague had informed Shimer that this number was useless), and Murray and Tech Traders' repeated refusal of an audit.

F.    Firth and Shimer acted as agents of Equity, and they committed their violations of Sections 4o(1)(B), 4m(1) and 4k(2) while acting as agents of Equity. Thus, Equity is liable for Firth and Shimer's violations of the Act pursuant to 7 U.S.C. § 2(a)(1)(B).

G.    Equity, Shimer, and Firth cheated or defrauded or attempted to cheat or defraud and willfully deceived or attempted to deceive pool participants or prospective pool participants by misrepresenting and failing to disclose material information about their expertise, qualifications, background and compensation, and their experiences in dealing with Coyt Murray and Tech Traders, making misrepresentations about the accountant verifying Shasta's balance with Tech Traders and about Tech Traders' producing account statements to Shasta in the PPM, recklessly misrepresenting the performance of the Shasta commodity pool and the role of the independent CPA Abernethy and affirming CPA Teague, and accepting disbursements to which they were not entitled, all in violation of Section 4b(a)(2)(i)-(iii) of the Act. Defendant Equity, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), is liable for the violations of Firth and Shimer because the actions and omissions of Firth and Shimer were done within the scope of their employment with Equity. Firth and Shimer are liable for the violations of Equity as controlling persons, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), since they, directly or indirectly, controlled Equity and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Equity's violation of Section 4b(a)(2)(i)-(iii) of the Act.

H.    Equity, Firth, and Shimer knowingly or recklessly employed or were employing a device, scheme, or artifice to defraud any client or participant or prospective client or participant by misrepresenting and failing to disclose material information about their expertise, qualifications, background, compensation, and their experiences in dealing with Coyt Murray and Tech Traders; by making misrepresentations about the accountant verifying Shasta's balance with Tech Traders and about Tech Traders' producing account statements to Shasta in the PPM; by

32

recklessly misrepresenting the performance of the Shasta commodity pool and the role of the independent CPA Abernethy and affirming CPA Teague; and by accepting disbursements to which they were not entitled, all in violation of Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A). Defendant Equity, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), is liable for the violations of Firth and Shimer because the actions and omissions of Firth and Shimer described above were done within the scope of their employment with Equity.  Firth and Shimer are liable for the violation of Section 4o(1)(A) of Equity as controlling persons, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), because they, directly or indirectly, controlled Equity and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Equity's violation of Section 4o(1)(A) of the Act.

I.	Shimer knowingly accepted Shasta participants' funds in an escrow account entitled Robert W. Shimer escrow, attorney escrow account, Shasta Capital Associates, LLC, on behalf of Equity, an unregistered CPO, when he knew that Shasta was a commodity pool and that therefore its manager, Equity was a CPO.  Consequently, Shimer committed or willfully aided, abetted, counseled, commanded, induced, or procured the commission of Equity's violation of Section 4m(1) of the Act, or acted in concert with Equity in such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by him or another would be a violation of Section 4m(1) of the Act, and is liable for the violation of Section 4m(1) of the Act by Equity as a principal pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).

J.	Firth and Shimer are liable for Equity's violation of Section 4m(1) as controlling persons, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), since they, directly or indirectly, controlled Equity knowing that it was an unregistered CPO and therefore did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Equity's violation of Section 4m(1).

Accordingly, judgment will be entered as follow:

**a.**  A permanent injunction against the Defendants prohibiting them from:

1. Engaging in conduct in violation of sections 4b(a)(2), 4k, 4m(1) and 4o(1) of the Act;

2. Directly or indirectly soliciting or accepting any funds from any person in connection with the purchase or sales of any commodity futures or options contract;

3. Engaging in, controlling, or directing the trading of any commodity futures or options accounts, on their own behalf or for or on behalf of any other person or entity, whether by power of attorney or otherwise;

4. Introducing customers to any other person engaged in the business of commodity futures and options trading;

5. Issuing statements or reports to others concerning commodity futures or options trading; and

6. Otherwise engaging in any business activities related to commodity futures or options trading.

Plaintiff has clearly established its right to an injunction pursuant to 7 U.S.C. § 139-1. The commission proved that given Defendants' history of past failed businesses and investments, their conduct in this case of deceit and recklessness, and their subsequent attempts to blame everyone else for the trouble they caused, there is a reasonable likelihood of future violations.  CFTC v. Muller, 570 F.2d 1296, 1300-1301 (5th Cir. 1978).

**b**. An Order requiring disgorgement. CFTC v. Co Petro Marketing Group, Inc., 680 F.2d 573, 583-84 (9th Cir. 1982).  Included in the award are the amounts received by Kaivalya investors, none of whom had any legitimate claim to the "proceeds" of the Shasta investors.  Shimer directly benefitted from these diversions because it kept the Kaivalya investors quiet, satisfied some of the personal notes he gave, and helped him avoid lawsuits and official scrutiny.  Equity shall be required to pay $612,500.  Shimer shall pay $1,452,117.  And Firth shall pay $450,313.  All awards are subject to pre- and post-judgment interest.

**c.** Civil monetary penalties shall be assessed against the defendants pursuant to 7 U.S.C § 13a-1(d)(1).  The penalties further the remedial purposes of the Act and deter others in the industry from committing similar violations.  Reddy v. CFTC, 191 F.3d 109, 123-24 (2d Cir.) 1999).  To merely bar these defendants from further violations of the Act and require them to pay back the money they received would be a meaningless penalty and not serve as a specific or general deterrent.  Given the egregious nature of their conduct as detailed in the Findings, the Court concludes an amount DOUBLE the gain to each defendant is warranted.  Thus, Firth shall pay $900,626, Shimer shall pay $2,904,234, and Equity shall pay $1,725,040.  All awards are subject to pre- and post-judgment interest.

**d.** An award of costs and fees pursuant to 28 U.S.C. §§ 1920 and 2412(c)(2).


   /s/ Robert B. Kugler

ROBERT B. KUGLER
United States District Judge